Argued October 19, 1924, affirmed January 8, 1924.

STATE v. ABRAHAM EVANS.

(221 Pac. 822.)

**Homicide—Indictment and Information—Indictment Held not to Charge Two Crimes, and to Properly Charge First Degree Murder.**

1. An indictment alleging that defendant, being engaged in the commission of robbery, by then and there being armed with a dangerous weapon, etc., did then and there commit an assault with said dangerous weapon, with intent then and there, if resisted, to kill, and that while so engaged he did kill deceased, *held* not to charge two crimes, murder in the commission of robbery and an assault with a dangerous weapon, or to charge murder in the second degree only, in the commission of a felony other than robbery, in view of Sections 1893, 1920, 1921, Or. L., and forms No. 2, 10 (Or. L., Vol. 1, p. 1346).

**Criminal Law—Confession on Wednesday Admissible, Though Sheriff Guilty of Wrongful Conduct on Monday.**

2. Admission of confession made on Wednesday morning *held* not error, though sheriff took defendant to morgue Monday evening, and compelled him to remain there about an hour in the presence of the body of the deceased.

**Criminal Law—Assumed That Instructions Advised Jury as to Consideration of Confession.**

3. Where defendant does not challenge any of the instructions given, the Supreme Court must assume that the jury were advised that a confession introduced could not be considered if it was not voluntary.

**Homicide—Evidence Held to Support Alleged Robbery.**

4. In a prosecution for murder incident to robbery, *held*, that there was evidence to support the alleged robbery.

**Criminal Law—Exception to Ruling Held not to Constitute Objection to Language Used by Court.**

5. An exception to ruling of the court admitting a hat in evidence over defendant's objection did not constitute an objection or

2. Admissibility of confessions, see note in 6 Am. St. Rep. 242.

exception for the use by the court in ruling on objection of the words: "He didn't say that. You are not quoting his answer correctly," and the court's use of such words cannot be considered on appeal.

**Criminal Law—Remarks of Court Held Harmless.**

6.   Remark of court to defendant's counsel, in response to an objection to evidence, wherein defendant stated that a certain witness had testified to certain things: "He didn't say that. You are not quoting his answer correctly," held harmless.

**Criminal Law—Evidence Held to Warrant Admission of Hat in Evidence.**

7.   In a prosecution for murder, evidence as to identity of hat found near body of deceased as that of defendant *held* to warrant its introduction in evidence.

**Criminal Law—Admission of Hat in Evidence Held Harmless.**

8.   In a prosecution for murder, if it was error to admit a hat in evidence over objection that it was not sufficiently identified as defendant's hat, *held*, that defendant was not harmed thereby.

**Criminal Law—Instructions of Court Held to Cure Statement of Prosecuting Attorney.**

9.   In a prosecution for murder incident to robbery, any possible harm to defendant from remark of district attorney: "No one but God and A. [the defendant] knows that J. [the deceased] had this money," *held* cured by an instruction not to consider such remark, because there was no testimony that the deceased had any money.

**Criminal Law—No Consideration of Remarks of Counsel in Absence of Objection to Ruling.**

10.   Where defendant did not object to any ruling of the court concerning remarks of district attorney, no complaint as to remarks of such counsel can be considered on appeal.

From Wasco: FRED W. WILSON, Judge.

In Banc.

Abraham Evans was accused of the murder of James Doran. The homicide occurred on September 10, 1921. Evans was convicted of murder in the first degree. The jury did not recommend life imprisonment; and consequently the trial court pronounced judgment of death. The defendant appealed.

Abraham Evans, James Doran and William H. Ducharme left Bend at about 8 o'clock A. M. on Saturday, September 10, 1921, in an automobile owned

and driven by Evans. Doran and Ducharme had been working in a logging camp operated by the Brooks-Scanlon Lumber Company; they quit work and got their time on September 9th. Doran and Ducharme planned to go to a ranch which is located near McMinnville and was owned by Doran; and when they separated Friday evening they did so with the understanding that they would meet at the depot and go by train to McMinnville. Doran was late Saturday morning and missed the train. Ducharme did not board the train because of the nonappearance of Doran. In the meantime Doran had met Evans and the latter, it appears, had offered to take Doran and Ducharme with him in his car. Ducharme says and all the circumstances indicate that it was understood, at least tacitly, that Doran and Ducharme were not to be under any obligation to pay fares for their ride. Evans with his two passengers arrived at The Dalles Saturday night at about 8 P. M., and Doran and Ducharme alighted at the Glenwood Hotel, leaving in the car two packs which they had brought with them. After Doran and Ducharme had been in the hotel a few minutes Evans came to the hotel and asked for and received from Ducharme $3, and at that time Evans represented that he had a friend who lived a short distance out of town and that this supposed friend would be disappointed if he, Evans, did not stay with him that night; and after some discussion Evans persuaded Doran and Ducharme again to get in the car and to accompany him to the home of the supposed friend. Evans drove out of town about three miles and stopped the car at the side of the road which was traveled but little and with his two passengers alighted from the car and started to go to the supposed home of the al-

leged friend. Soon after they alighted from the car Doran was shot three or four times and was killed, and Ducharme was shot once in the shoulder. Ducharme testified that Evans did the shooting. Ducharme ran and escaped and he made his way to the home of a farmer; and subsequently word was sent to Sheriff Levi Chrisman at The Dalles. The body of Doran was found early Sunday morning outside of the road and about forty yards from where Evans had stopped the car.

At about 10 P. M. Saturday night Evans drove into the Motor Service Garage at The Dalles and left his car there and then went to the Chapman Boarding House, where he paid $1 for a room. The next morning, Sunday, Evans got his car and left The Dalles, intending, as the evidence indicates, to return to Bend. Sheriff Chrisman upon receiving word of the crime at once drove to the scene of the homicide. Ducharme accompanied Sheriff Chrisman back to The Dalles and stayed at the Glenwood Hotel the rest of the night. At some time on Sunday Evans was arrested at Madras. It is a reasonable inference to conclude that Evans when arrested was returning to Bend where he and his family lived. Sheriff Chrisman, upon receiving word of the arrest of Evans went to Madras, arriving there Sunday evening. Sheriff Chrisman remained in Madras over Sunday night, and Monday morning he started with the defendant for The Dalles, arriving there about 4:30 P. M.

Sheriff Chrisman says that he had inquired of Evans whether he knew Doran and Ducharme, and since "he didn't seem to know them" he, Chrisman, took Evans to the coroner's office or morgue Monday evening so that Evans could view the body of Doran

and thus enable the sheriff to determine whether
Evans did or did not know Doran. In the mean-
time a messenger had gone for Ducharme, and after
the expiration of some time Ducharme appeared at
the coroner's office or morgue where Evans was still
detained by the sheriff. After having been com-
pelled to remain at the morgue in the presence of
the body of Doran for about an hour, Evans was
again taken to the jail. The next day, Tuesday, an
attorney, who appeared to have been representing
Evans at that time, called at the jail and saw Evans
twice, once in the morning and again in the after-
noon. Early Wednesday morning when the jailer
came to feed the prisoners Evans asked the jailer to
send for the sheriff and district attorney and stated
that he wished to tell all the truth. The sheriff and
district attorney were sent for and soon after their
arrival the defendant made a confession revealing
all the details and acknowledging his guilt.

AFFIRMED.

For appellant there was a brief and oral arguments
by *Mr. W. P. Myers* and *Mr. John Gavin.*

For respondent there was a brief and oral argu-
ment by *Mr. Francis V. Galloway,* District Attorney.

HARRIS, J.—In *State* v. *Hecker,* recently decided,
we examined all the arguments made against the
validity of the constitutional amendment of 1920 re-
storing capital punishment as well as all the argu-
ments advanced in support of the notion that no
statute exists prescribing the method of executing
the death penalty. We decided in *State* v. *Hecker*
that the constitutional amendment of 1920, desig-
nated as Article I, Sections 37 and 38 (Laws 1921,

p. 6), had been regularly adopted and that the
method of executing the death penalty is prescribed
by statutory authority; and, consequently, it is not
necessary again to discuss the contentions mentioned.

1. The defendant insists that the indictment charges
two crimes: (1) murder in the commission of rob-
bery; and (2), an assault with a dangerous weapon.
And the argument of the defendant goes to the ex-
tent of asserting that the indictment does not charge
murder in the first degree, but that it charges murder
in the second degree in the commission of a felony
other than rape, arson, robbery or burglary. The
indictment, omitting some of the formal parts, reads
thus:

"The said Abraham Evans on the 10th day of Sep-
tember, A. D. 1921, in the County of Wasco and
State of Oregon, then and there being and then and
there being unlawfully and feloniously engaged in
the commission of robbery, by then and there being
armed with a dangerous weapon to wit, a gun loaded
with gunpowder and balls a more particular descrip-
tion of said dangerous weapon being unknown to
this grand jury; did then and there commit an as-
sault with said dangerous weapon upon one James
Doran, the said James Doran then and there being
within shooting distance of the said dangerous weapon,
with intent then and there had by the said Abra-
ham Evans, if resisted, to kill or wound the said
James Doran; and then and there unlawfully and
feloniously took from the person of said James
Doran, and against his will, paper currency and
divers coins, lawful money of the United States, the
denominations, kinds, and amounts of which are un-
known to this grand jury. And the said Abraham
Evans, while so then and there engaged in the com-
mission of said robbery, in the manner aforesaid, did
then and there by his act, purposely, unlawfully and
feloniously kill the said James Doran, by shooting

him, the said James Doran, with said dangerous weapon. * * ''

Our Code, Section 1893, Or. L., reads thus:

"If any person shall purposely, and of deliberate and premeditated malice, or in the commission or attempt to commit any * * robbery * * kill another, such person shall be deemed guilty of murder in the first degree."

It will be observed that the language is "any" robbery. "Assault and robbery, being armed with a dangerous weapon," is defined by Section 1920, Or. L., while "robbery by putting in fear, not being armed with a dangerous weapon" is defined by Section 1921, Or. L. Our Code prescribes the form for an indictment charging a killing in the commission of a robbery. The form so prescribed is form No. 2, Vol. 1, Or. L., page 1346. It will be observed that this form begins thus: "Was engaged in the commission" of robbery "by [stating it, as in an indictment therefor]." Form No. 10 is the form for an indictment charging robbery, being armed with a dangerous weapon. An examination of the indictment in the instant case discloses that it was drawn by following form No. 2 in connection with form No. 10.

Since it is *apropos,* we quote the language of Mr. Justice BEAN in *State* v. *Morris,* 83 Or. 429, 434 (163 Pac. 567, 569): "The indictment complies substantially with the terms prescribed by the statute." We hold that the indictment is not defective in either of the particulars mentioned by the defendant.

2. It is contended that the court erred in admitting the confession made by Evans Wednesday morning. This contention is based primarily upon the fact that Sheriff Chrisman took Evans to the morgue Monday

evening and compelled him to remain there about an
hour in the presence of the body of Doran. Even
though it be assumed for the purposes of discussion
that the sheriff ought not to have taken Evans to the
morgue, and that having taken Evans to the morgue
the sheriff ought not to have compelled him to re-
main standing there for an hour, and even though it
be further assumed that Evans while at the morgue
sank to the floor, whether caused, as the defendant
now says, by having been forced to stand for an hour
in the presence of the body of Doran, or whether
caused, as the state contends, by the shock produced
by the appearance of Ducharme as a living witness
of the killing of Doran; nevertheless, notwithstand-
ing all or any of such assumed facts, it affirmatively
appears from the record that Evans made no con-
fession until Wednesday morning. Indeed, the de-
fendant refused to talk Monday night. It is not
claimed nor even intimated that the defendant was
subjected to any improper or objectionable treatment
after he was taken from the morgue. Moreover,
when the district attorney arrived at the jail and
was informed that Evans wished to make a con-
fession he advised him more than once that any con-
fession he might make would be used against him
in the trial; and, besides, Evans had twice on the
previous day consulted with his attorney. The un-
contradicted testimony of G. L. Coleman the jailer is:

"When I went into the jail about 7 o'clock in the
morning to feed the men, Abe said he didn't feel
very good. 'I didn't have a very good night's sleep
last night, I was walking and praying all night,' he
said. 'I saw my mother and two sisters last night,'
and I asked him where his mother was, and he said
she was dead, and he said he wanted to see the sheriff
and district attorney, and he wanted to talk, he

said he wanted to tell them everything, he wanted to tell the truth, didn't want to tell a lie, and I asked him if he wanted me to 'phone for them, and he said yes, which I did.''

3. The defendant does not challenge any of the instructions given by the court, and we must therefore assume that the jury were advised that the confession could not be considered if it was not voluntary. The confession received in evidence was clearly competent and no error was committed in its reception.

4. It is next claimed that there was no evidence to support the alleged robbery. The record, as we read it, is literally filled with evidence showing robbery. Saturday evening at the Glenwood Hotel Evans asked Ducharme for $3, and the latter gave the amount to the defendant. Four witnesses testified that when Doran's body was found some of the pockets of his clothing were turned wrong side out. A nickel and a pocket-knife were found on the ground about six inches from one pocket of Doran's pants as the body lay upon the ground. When the defendant was arrested at Madras a cursory search was made, and the sum of $7.65 was found on his person; but upon the arrival of Sheriff Chrisman Sunday evening a careful search was made with the result that $50 in currency was found concealed in the toe of one shoe and $50 was hidden in the cuff of one leg and $35 in the cuff of the other leg of the trousers worn by the defendant. After the homicide the two packs owned by Doran and Ducharme were found in the Glenwood Hotel; and Ducharme testified that his pack had been opened. Moreover, the defendant in his confession admitted that he took Doran's money. In the defendant's brief much is said about failure to show whether the trousers worn by Evans

when searched were also worn by him when arrested or prior thereto. There is ample evidence to justify the conclusion that the trousers mentioned were worn by Evans from the time he left Bend Saturday morning until the time of the search made by Chrisman on Sunday.

Mrs. H. N. Madden discovered a hat about sixty feet from the place where Doran's body was found. Manheimer Brothers maintained a store at Bend, and E. W. Marshall, who clerks in the store, testified that the hat came into the Manheimer Brothers stock a "year ago this September," or in September, 1920; that he remembered that he waited on Evans but couldn't remember "just exactly what he bought," although he further testified, "I am under the impression that I sold him a hat, but to state definitely I can't." Sheriff Chrisman told the jury that when he brought the defendant from Madras to The Dalles the defendant was without a hat and that he claimed that he had lost his hat while crossing the bridge over the Deschutes River when en route from The Dalles to Madras. Ducharme, when shown the hat said: "I couldn't swear whose hat it is, but it looks like the hat Abe Evans wore. * * On the night I was with him, and the day." The hat was marked "E" for identification and the district attorney offered the hat in evidence. We now look to the record for a history of what then occurred:

"By Mr. Myers: We object for the reason that this witness has failed to identify the hat, he says it looks like the hat but he wouldn't say it was the same hat, and it has not been properly identified as the hat of Abe Evans.

"By the Court: He didn't say that. You are not quoting his answer correctly.

"By the Court: Objection will be overruled and the hat admitted in evidence.

"(Whereupon, the offer was received in evidence and marked by the reporter as State's exhibit "E").

"By Mr. Myers: Save an exception."

5, 6. The state had been endeavoring to introduce the hat as evidence, and all the testimony, thus far relating to the hat, had been given. The defendant was resisting the attempt of the state to introduce the hat. The state offered the hat; the defendant objected; the court overruled the objection and received the hat; and the exception saved by the defendant was an exception to the ruling admitting the hat. The defendant now complains because the court said: "He didn't say that. You are not quoting his answer correctly." The record contains nothing indicating an objection by the defendant to the language which the court used and the defendant now questions; and hence not having then excepted to the language the defendant is now precluded from complaining about it. However, we are of the opinion that the language used by the court could not have worked any injury to the defendant and that it did not do him any harm.

7, 8. Doran's hat was not found. There is evidence to sustain a finding that Evans wore a hat when he returned to The Dalles Saturday night and stored his car in the Motor Service Garage. There was evidence to support a finding that Evans pursued Ducharme when the latter was running away after Evans had shot Doran and Ducharme. The theory of of the state was that Evans lost his own hat when in pursuit of Ducharme, and that having lost his own hat he took Doran's hat and wore it back to The Dalles, and the next morning threw Doran's hat in the Deschutes River in order to destroy evidence. There was suffi-

cient evidence relating to the identity of Exhibit "E" to warrant the court in receiving it. The weight of the evidence was of course for the jury. However, if it be assumed that there was not sufficient evidence relating to the identity of exhibit "E" to warrant its reception, admission of the hat in evidence could not, in view of all the other evidence, have done any harm to the defendant.

9. H. E. Allen, the assistant manager of the Brooks-Scanlon Lumber Company, was called as a witness for the state and he had with him the company's records showing the names of its employees, and the dates and amounts of payments made to employees. Allen was asked if he could tell from the records whether Doran worked for the company "and what wages he drew and when he drew them." The defendant objected and in the course of the ensuing discussion of the objection the district attorney said: "No one but God and Abe Evans knows that James Doran had this money." The defendant first asked the court to instruct the jury to disregard the remark of the district attorney, and then the defendant moved that the court declare a mistrial because of the remark; and thereupon the court, addressing the jury said:

"The court will say to this jury to entirely disregard and lay aside absolutely from your minds the remark just quoted and referred to which is before the court made by the district attorney, and that Abe Evans and his God alone knows the amount of money that was in James Doran's pockets, no testimony in this case as yet to that effect, and I want you to absolutely and entirely dismiss it from your minds and not take it into consideration, that remark, at any part of the case. With that instruction the motion will be overruled."

It is manifest that the instructions given by the court completely cured any possible harmful result that may have been produced by any possible misconduct involved in the remark of the district attorney.

10. The defendant also complains in his printed brief of some remarks made by the district attorney in his closing address to the jury. But the defendant did not except to any ruling of the court concerning these remarks, and consequently no question involving them is here for decision.

We have carefully read the entire record once, and we have also a second time read all the record, except the testimony relating to the defense of insanity; and we are convinced that the defendant was zealously and ably defended and that he had a fair trial in a court which was presided over by an experienced and learned judge who carefully preserved for the defendant every right to which he was entitled.

We do not find any prejudicial error in the record, and, therefore, we are obliged to affirm the judgment.

AFFIRMED.