Argued March 1, affirmed April 2, 1965

# STATE OF OREGON *v.* THOMAS

400 P. 2d 549

*Charles A. Telfer,* Grants Pass, argued the cause and filed briefs for appellant.

*Gary F. Hermann,* District Attorney, Grants Pass, argued the cause for respondent. With him on the

brief was Fred B. Robinson, Deputy District Attorney, Grants Pass.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell, Goodwin, Denecke and Holman, Justices.

GOODWIN, J.

The defendant appeals from a conviction of involuntary manslaughter. He had been indicted and tried for first-degree murder.

The first question is whether a jury, upon a felony-murder indictment, may lawfully return a verdict of involuntary manslaughter.

The indictment alleged in effect that Norman Thomas and Jerry Oden beat Lloyd Harper to death in the course of robbing him. Oden was tried separately and was convicted of voluntary manslaughter.

There was evidence in Thomas's trial that Oden and Thomas had been drinking with Harper and another man, Gary Banta. Banta testified that Oden and Thomas had discussed during the evening a plan to "roll" Harper for his money. There was evidence from other witnesses which tended to prove such a conspiracy. There was also evidence that Oden and Thomas did take Harper's money and watch, and that in doing so they beat and kicked him. The defendant produced contradictory evidence.

Thomas testified that his only part in the affair was that he found himself stumbling around on the periphery of a scuffle between Oden and Harper, and while so occupied he happened to retrieve Harper's watch, which he found lying on the ground. Thomas's testimony was consistent with evidence of consumption of beer by all parties to a degree that it may have played some part in the evening's activities. In any

184

event, the jury could have believed Thomas, or it could have believed any or all of the other evidence.

■ If the jury believes that death was caused by acts done in the commission of one of the felonies named in ORS 163.010, the jury should return a verdict of first-degree murder. If, however, there is a conflict in the evidence concerning the commission of the felony described in the indictment, but the jury is satisfied from the proof that manslaughter has been committed, there is no good reason why the jury should not be permitted to return a verdict of a degree of manslaughter consistent with the facts as the jury finds them. *State v. Wilson*, 182 Or 681, 189 P2d 403 (1948).

■ In the case at bar, there was a conflict in the evidence concerning the participation of this defendant in any plan to rob Harper; there was a conflict in the evidence whether the victim was in fact robbed; and there was a conflict in the evidence whether the beating suffered by the victim was a felonious battery connected with a robbery or merely the unintended by-product of an evening spent touring taverns.

The jury was entitled to find the defendant guilty of first-degree murder, but it was not bound to do so. It could have found him guilty either of voluntary manslaughter or of involuntary manslaughter.[1] If the

---

[1] ORS 163.040. "(1) Any person who, without malice express or implied, without deliberation, and upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible, voluntarily kills another, is guilty of manslaughter.

"(2) Any person who, in the commission of any unlawful act, or a lawful act without due caution or circumspection, involuntarily kills another, is guilty of manslaughter. The provisions of this subsection shall not apply to the killing of any person where the proximate cause of such killing is an act or omission defined as negligent homicide in ORS 163.091.

"* * * * *."

jury believed only that part of the evidence which was consistent with death caused in a drunken brawl, then it was proper to find Thomas not guilty of the felony-murder, and guilty of manslaughter. It was for the jury to decide whether the manslaughter was voluntary or involuntary.

It remains to be decided whether any of the other errors assigned by the defendant require a new trial.

Two assignments of error challenge the sufficiency of the indictment. One assignment urges that the indictment charges no crime at all. Another assignment asserts that it charges two crimes: armed robbery and unarmed robbery. Neither assignment has merit.

■ Since the indictment does not allege that the defendants were armed, it obviously does not attempt to charge the commission of armed robbery (ORS 163.280). But the facts described rather plainly fall within the reach of ORS 163.290, which denounces robbery while not armed with a dangerous weapon. Felony-murder under ORS 163.010 may be committed while committing either kind of robbery. Accordingly, the indictment charges one crime, murder in the first degree, committed in the course of an act or acts made unlawful by ORS 163.290. The failure of the indictment to distinguish between armed and unarmed robbery is immaterial in a murder case. It is sufficient to allege that the death of the victim was caused by acts done in the commission of any robbery. *State v. Evans,* 109 Or 503, 509, 221 P 822 (1924). If the state had attempted to prove under the instant indictment that the defendant was committing some other type of felony, such as arson, the defendant might properly have objected that the indictment had not put him

on notice, but no such attempt was made and the problem of a variance is not before us.

■ Other assignments of error challenge the sufficiency of the evidence to support the state's theory that this defendant was party to a preconceived plan to rob Harper, and that this defendant actually participated in the robbery. We have read the transcript with care and are satisfied that there was evidence to support submission of first-degree murder to the jury.

■■ Error is assigned to the overruling of an objection to certain testimony of a female companion of the defendants. The woman testified that she was with the two men most of the evening, except for about an hour while she was doing some laundry. We quote:

"Q  Then when is the next time you saw either Jerry [Oden] or Norman [Thomas]?

"A  Well, Jerry come running around the corner, and I was sitting in the car, and—

"Q  Had you finished the laundry by then?

"A  Yes sir, and I had already put it in the car. And Jerry came running around the corner, and I asked him, I said 'Jerry, are you guys in trouble already?' and he said—

"* * * * *

[Objection by counsel, and colloquy out of the presence of the jury. Objection overruled by the court.]

"Q  That means you can answer the question.

"A  And I asked—I said 'Are you in trouble?' And I said 'If you're in trouble I don't want any part of it,' and he says 'We got a hot one around the corner and we're gonna take him for his money,' and I said 'I don't want any part of it, Jerry, not any part of it at all.' And he says 'Well, don't

worry, Babe, we're just gonna get this guy some booze and take him home, and he's gonna pay us for it,' so I thought that was okay.

"Q What happened then?

"A So then Jerry started the car and we went around the corner, and we picked up Norman and this man, this Mr. Harper. Do you want me to tell you what he—

"Q Just go ahead and tell us what happened after that.

"A Well, Norman helped this old man in the car. He didn't force him or anything, he just helped him, because the man looked pretty drunk to me, so he helped him to get into the car, and then he got in himself, and he said something about going to the A Street—Norman said something about going to the A Street Market and getting this guy some booze, so we drove along and we passed the A Street Market, and it was closed, so Norman said he knew a place further on out that they sold— there was a little store or market out there that they could get some booze, and so Jerry said he didn't know where it was, and Norman says 'Well, you just drive where I tell you to.' He says 'I know where it is.' * * *"

At the time the quoted testimony came into the record, there was before the jury other evidence from which the jury could have drawn an inference that Thomas and Oden intended to get Harper drunk and obtain money from him. Whether or not the conspiracy had ripened into a scheme to use force upon Harper was for the jury to decide. There was ample evidence of a conspiracy to take advantage of Harper in some unlawful way in order to get his money.

The woman's testimony was competent. While her story of what Oden had said was hearsay evidence of an intent on the part of Thomas to obtain Harper's

money, her hearsay was an exception to the hearsay rule, under ORS 41.900(6):

"After proof of a conspiracy, [evidence of] the declaration or act of a conspirator [may be given] against his coconspirator, and relating to the conspiracy."

Such testimony cannot be introduced before the state produces sufficient evidence to justify a jury in finding that a conspiracy did, in fact, exist, *State v. Booth,* 82 Or 394, 161 P 700 (1916), but once the state has put on sufficient evidence of a conspiracy, the hearsay statements of conspirators are competent evidence against other members of the conspiracy. *State v. Keller,* 143 Or 589, 599, 21 P2d 807 (1933), quoted with approval in *State v. Gardner,* 225 Or 376, 384, 358 P2d 557 (1961).

■ Another assignment of error challenges the receipt in evidence of two signed statements which the defendant asserts were received contrary to the rule announced in *State v. Neely,* 239 Or 487, 395 P2d 557, opinion on rehearing, 239 Or 487, 398 P2d 482 (1965). Thomas contends that his interrogation after his arrest violated his right to counsel. He gave the police an oral statement before the officers advised him of his constitutional right to counsel and to remain silent. Thereafter, Thomas contends, his written statements, even though given after he had been advised of his rights, were infected with unconstitutionality under the rule in the *Neely* case.

We need not decide in this case whether the questioning of Thomas before he was advised of his rights made his subsequent written statements inadmissible, because it is clear in the present case that the statements had no prejudicial effect upon the jury. One of the statements contained the same story Thomas

told when he took the stand. See *State v. Dotson,* 239 Or 140, 396 P2d 777 (1964). That statement is simply a self-serving declaration to the effect that Thomas was an unwitting party to a transaction that was essentially accidental.

Another statement, which did contain incriminating material, might have presented a problem under the rule in *State v. Neely,* supra. Whether or not its admission over the defendant's timely objection would have constituted reversible error if the jury had found Thomas guilty of any degree of murder, there is no basis for inferring prejudice in the case at bar. In finding Thomas guilty of involuntary manslaughter, the jury necessarily had to reject the state's theory of a planned robbery. The jury thus acquitted the defendant of the only degrees of homicide that might have been proven by the signed statement if it was erroneously received.

The jury demonstrated by its verdict that it did not believe that the defendant had been party to a plan to rob Harper. If the jury did not believe the statement by which Thomas admitted his colorable participation in the robbery or conspiracy to rob, the defendant cannot claim that he was prejudiced by the receipt of the exhibit in evidence. Since the record affirmatively shows that Thomas could not have been prejudiced by the receipt in evidence of the exhibits which he now challenges, we believe that the error, if there was one, would fall within the statutory admonition that harmless error may be disregarded. ORS 19.125(2).

A final assignment of error challenges the receipt in evidence of the dead man's watch, which the police obtained from Thomas's automobile under circumstances that the defendant says constituted an il-

legal search. There was a question of fact whether or not Thomas consented to the search of his automobile. We need not decide, in this case, whether the trial court made either a proper record of its preliminary findings of fact on this constitutional question, or, indeed, proper findings, because again, as in the case of the signed statements which were received in evidence, it is obvious that the challenged evidence in no way prejudiced the defendant. By the defendant's own testimony, he was present and, in some degree, was a party to the killing. The jury apparently believed that, insofar as this defendant was concerned, the killing was an accidental byproduct of a drunken brawl, or, involuntary manslaughter.

There is no error which would justify disturbing the verdict and judgment in this case.

Affirmed.