Argued June 28, decided August 3, 1910.

## STATE *v.* MEYERS.

[110 Pac. 407.]

HOMICIDE—EVIDENCE—THREATS BY ACCUSED.

1. Evidence of threats made by accused against the person whom he subsequently killed may be introduced to show deliberation or malice, and threats against a particular class of persons are admissible in a prosecution for killing a member of that particular class, but in a prosecution for killing a policeman who had arrested accused a statement that accused said in talking of the arrest of another person that, "if they arrested me like that fellow was arrested, I would shoot them," is inadmissible, as being too remote; no showing being made of the circumstances attending the arrest about which the remark was made.

HOMICIDE—ARREST WITHOUT AUTHORITY—RESISTANCE.

2. Where an arrest is made by a known officer without authority and nothing is to be reasonably apprehended beyond a mere temporary detention in jail, resistance cannot be carried to the extent of taking life.

HOMICIDE—EVIDENCE—QUESTION FOR JURY.

3. Evidence in a prosecution for murder *held* not to warrant the court in assuming that the arrest of accused just prior to the killing had the effect of exciting in his mind a sudden heat of passion such as to make the desire to kill irresistible, but the question was for the jury.

HOMICIDE—APPEAL AND ERROR.

4. Where, in a prosecution for murder, the jury bring in a verdict of murder in the second degree, error of the court in refusing to take from the jury the question of murder in the first degree *held* harmless.

CRIMINAL LAW—NEW TRIAL—READING OF AUTHORITIES.

5. Where the court believes itself sufficiently advised as to the law in a criminal prosecution, it has the right to refuse to hear counsel further or to listen to the reading of authorities.

From Marion: GEORGE H. BURNETT, Judge.

Statement by MR. JUSTICE MCBRIDE.

The defendant, George Meyers, was indicted for murder in the first degree committed by shooting one Thomas Eckhart.

The evidence as to the immediate fact of the shooting consisted principally of the dying declaration of the deceased and the testimony of defendant. Defendant was occupying a room in a building owned by his father and occupied by his brother Arthur Meyers, and occasionally by himself. On the evening of the shooting, a dispute arose between the brothers, caused by defendant's placing his wet boots on some sofa pillows which were in the room, and Arthur went upon the street and requested deceased, who was a policeman, to put defendant out of the room, but not to arrest him. Deceased went to the room and found defendant asleep in a chair. That part of deceased's dying declaration which was admitted in evidence is as follows:

"I, Thomas M. Eckhart, being conscious of my present condition, and realizing no hope of recovery, do make this my final declaration: Then I went to room with Arthur and found George Meyers who was sitting in a chair sleeping. I woke him up and says: 'Moley says his father gave him orders to keep you out.' George says: 'All right I will pack my clothes.' George put his clothes in a small box. I started downstairs with him. He says: 'What are the charges?' I says: 'I don't know, but have orders to lock you up when I found you.' I had hold of his left arm. We walked along to place of shooting and talking friendly on the way. We walked down High Street to the city hall, then turned west on Chemeketa and stopped a few feet from outside jail door, then he says, 'Some one in there looking in the window.' I says, 'There might be,' and, as I turned from the window and faced him he says, 'Take that you son of a bitch,' and then shot me, pulling a pistol out of a slicker coat, standing at the time beside me, while I was holding his arm. I was shot first in the abdomen. Then I went down. He made two or three

steps, turned around, and shot me again, this time in the leg. Then he ran across street north and turned down the alley."

The testimony of defendant is as follows:

"A. The first I remember of Mr. Eckhart being around me when he woke me up. I was sitting in a big rocking chair in the room. My feet were on the other chair. He had knocked my feet off of the chair. He woke me up. I don't know the exact words he used. I had been out horseback riding. I was kind of dazed. I had been drinking some, I will admit. He said something about coming out of there. I says 'All right.' I don't know the exact words he used. Of course, I was nervous; in fact, I didn't pay much attention to him. So I started to go out, and he says, 'Hurry up, I can't wait here all evening.' I says, 'All right'; I says, 'Is it raining?' He says, 'I don't know. It may be.' I says, 'I will put on my slicker, maybe it is raining.' I got my slicker, and we started down the steps. I asked him what the charges were, and he said he didn't know, he had orders to lock me up. I didn't say anything to him until we got in front of Yannke's livery stable.

Q. Just opposite the court house?

"A. Yes; I asked if he had warrant for me and he said, 'No.' I broke away from him. I say 'You have no right to take me without a warrant.' He says 'God damn you, I will take you anyway.' He twisted my arm back and pushed me along. He said, if I couldn't come along decent, he had a way of taking me. I kept talking to him the best I could under the circumstances. He told me to keep my mouth shut and come along. He had hold of my arm practically until we got to the city hall. I told him he was hurting me, and asked if he would let go of my arm. He did and grabbed me by the shoulder on the left side. After we turned the corner at the city hall and got pretty close to the office of the city marshal, I says, 'Will you let me phone to Doc. Gibson?' He says, 'No; I won't.' I kind of thought over the matter, and I thought, if anybody knew what I was arrested for, he would surely know. I knew I had not done anything. I says, 'I will be damned if I go in there.' I broke away from him. He turned and says, 'By God, you will go in there!' He reached for his hip pocket. At that I fired the shot.

Q. Did you realize at the time how many shots you fired?

"A. No, sir; I did not."

The defendant also denied that he had the alleged conversation related by the witness, Sol Anderson.

Arthur Meyers testified, among other things, as follows:

Q. What did you do after you went down?

"A. I walked up and down the street a few times, and didn't see anybody. I walked down by the White House Restaurant. Mr. Eckhart was in there. I motioned for him to come out. I says, 'George is up in my room, and I cannot do anything with him. I would like for you to come up there and take him out.' I says, 'I don't want him arrested. I just want him taken out.' He went up there with me and George was asleep. He woke him up and says, 'George, Arthur wants you out of the room. You had better get up and put on your coat and come on; by the way, I have orders to arrest you on sight.' I spoke up and asked what he was arrested for. He said he didn't know; that Doc. Gibson told him to arrest him when he saw him. George said all right, he would go. He went over and got his coat and started out with him.

Q. Where was his coat?

"A. Hanging up in the partition. The room is a large room. In one end is a partition about eight or nine feet high. It was hanging on the other side of the partition, the side away from the main part of the room.

Q. What kind of a coat did he get?

A. "A black slicker."

There is evidence tending to show that deceased fell at the first shot; that defendant shot him again, wounding him in the leg, then ran a short distance, stopped, and fired a third shot, which did not take effect.

It was admitted by the State that no order had been given or warrant issued for defendant's arrest, and there is no testimony indicating that defendant had been guilty or accused of any offense against the law at the time Eckhart arrested him. During the trial the State called one Sol Anderson as a witness and propounded to him the following questions, over the objection of defendant:

"Q. Do you recall a conversation you had with him (referring to defendant) some time last spring about the time that Mr. Swegle was arrested?

"A. Yes; I don't know his name.

"Q. You may state to the jury what, if anything, he said that time with reference to shooting a policeman? * *

"A. We was running an automobile garage down here, Mr. Linn and I, and he came down to the shop. He used to clean Mr. Hauser's machine before he gave us the job of taking care of the machine. He laid a gun up in the side. I asked him what he carried that around for. He said, 'I use that to shoot down the river.' A short time after this man Swegle was arrested he was pretty mad. He said, 'If they arrest me like that fellow, I would shoot them.' I didn't think he meant it when he said it. When he did what he did it came to our minds."

A motion was made to strike out the testimony, but was overruled, except as to the last sentence, which was stricken out.                    Reversed.

For appellant there was a brief with oral arguments by *Mr. John A. Carson, Mr. Peter H. D'Arcy, Mr. Samuel T. Richardson* and *Mr. William M. Kaiser.*

For respondent there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, *Mr. Isaac H. Van Winkle,* Assistant Attorney General, *Mr. John H. McNary,* District Attorney, and *Mr. Walter C. Winslow,* Deputy District Attorney, with oral arguments by *Mr. Van Winkle* and *Mr. Winslow.*

Mr. Justice McBride delivered the opinion of the court.

1. We are of the opinion that the court erred in admitting the testimony of the witness Anderson. Evidence of threats made by defendant against a person subsequently killed by him may be introduced to show deliberation, premeditation, or malice. Wharton, Homicide, § 601, and cases there cited. And threats against a particular class of persons, as, for instance, a threat to kill all policemen, are admissible in a prosecution for killing a member of the

particular class indicated in the threats. Wharton, Homicide, § 603. In the case at bar it appears that defendant had said, in effect: "If they arrest me like that fellow was arrested, I would shoot them." No showing was made of the circumstances attending the arrest in question, whether it was made by an officer or by some private person, and the witness Anderson, was unable to state even the name of the person arrested. It was a casual remark made several months before, and evidently did not refer to deceased. Nor was it shown to have referred to policemen or arresting officers as a class. The evidence was too remote to have any legitimate bearing upon the case at bar. *Stevenson* v. *United States,* 86 Fed. 106 (29 C. C. A. 600) ; *Earles* v. *State,* 47 Tex. Cr. R. 559 (85 S. W. 1.) The admission of this testimony was highly prejudicial to defendant, and was reversible error.

2. Several requests were made for special instructions. Many of these were substantially covered by the general charge, and as to those not so included the refusal was proper. They may, for the sake of brevity, be divided into two classes: (1) Those which assume that a person unlawfully arrested has a right to take life, if necessary to free himself from such unlawful detention. (2) That a homicide committed in resisting an unlawful arrest cannot as a matter of law be a greater offense than manslaughter. Neither of these propositions are sound law. While there are cases holding that one threatened with unlawful arrest may use such force as may be necessary to free himself, and maintain his liberty, even to the extent of taking the life of the aggressor, we are inclined to adopt the more humane and civilized rule, that, where the arrest is made by a known officer and nothing is to be reasonably apprehended beyond a mere temporary detention in jail, resistance cannot be carried to the extent of taking life. This is the doctrine announced by Mr. Wharton in his work on homicide, and the authorities cited by

The appellant, Linifred Isakson, was arrested in Mult-him amply sustain it.   Wharton, Homicide, § 409, and cases there cited.

We do not wish to be understood as holding that cases may not arise in which one may use a deadly weapon to protect himself against an unlawful arrest.   Thus where the arresting party himself uses a deadly weapon or signi-fies his immediate intention to do so, or where an unau-thorized person, being armed, attempts to break into one's dwelling to make an unlawful arrest, or where it is attempted in such a way as to put one in fear of death or great bodily harm, in such rare instances one may be justified in using a deadly weapon.   But we wish to be understood as holding emphatically that, where the attempted arrest is made by a known officer, and there is nothing to be apprehended beyond a mere temporary detention, the question of the right of such officer cannot be tried out with a pistol.

3. We do not think that the court had a right as a mat-ter of law to assume that the arrest had the effect of exciting in the mind of the prisoner a sudden heat of passion, such as to make the desire to kill irresistible, and therefore manslaughter.  The jury had all the facts before them, and it was for them to judge what effect the arrest had or might have had on the defendant.   While the arrest was practically admitted by the State to have been unlawful and without cause, there was some evi-dence which the jury had a right to consider which tended to show malice.   The facts, as claimed by deceased, that before leaving the room defendant put on a "slicker" having a pistol in the pocket, that he told deceased that somebody was looking out of the jail window, apparently with a design to attract his attention, and thereafter immediately shot him, and that he continued to fire after deceased had fallen, were circumstances which might well have justified the jury in finding that there was express malice.

4. It is unnecessary to consider the alleged error of the court in refusing to take from the jury the question of murder in the first degree, as the verdict of murder in the second degree operated in any event to acquit defendant of the higher crime, and he was therefore not prejudiced by any ruling made on that subject.

5. It was not error in the court to refuse to listen to the reading of authorities upon the argument of the cause. If the court thought itself sufficiently advised as to the law, it had the right to refuse to hear counsel further, and the very clear and exhaustive charge given in this case indicates that the court was well advised as to the law.

We find no other error in the record, but for the reasons given above this cause must be reversed, and a new trial ordered.                                    REVERSED.