Respondent's motion to expunge allowed in part, November 10, appellant's petition for rehearing allowed December 5, argued December 19, 1956, affirmed March 6, 1957

# STATE OF OREGON *v.* REYES

303 P. 2d 519
304 P. 2d 446
308 P. 2d 182

Sidney B. Lewis, Jr., District Attorney, and James
W. Walton, Deputy District Attorney, Corvallis, for the
motions.

■■■■■■■■■■

Mix & Fenner, Corvallis, contra.

■■■■■■■■

LUSK, J.

The case is before the court on several motions of the respondent, State of Oregon, to strike from the record the transcript of testimony, transcripts of certain affidavits, and of a motion for a new trial, and two envelopes containing exhibits. The motions are based on two grounds: First, that the documents and exhibits referred to have not been made a part of the bill of exceptions, and, second, that the appellant (defendant in the court below) failed to comply with a rule of the circuit court requiring service of a proposed bill of exceptions on the opposing party.

On August 22, 1956, there was filed in this court a document entitled "Defendant's Bill of Exceptions." On the same day there were filed here two volumes of testimony authenticated by the official reporter. On the cover of the bill of exceptions is stamped the receipt of the county clerk of Benton County reading: "Received the 7th day of August, 1956. Ralph P. Schindler, County Clerk by Hulda Wrigglesworth, Deputy Clerk." The bill of exceptions consists of a statement of 22 exceptions taken by the defendant to rulings of the court, some prior to trial, most of them upon the trial. It contains a single reference to the transcript of testimony. Exception No. 8, relating to testimony received over the appellant's objections, recites: "This testimony and evidence is too extensive to be set forth here in detail, but is contained throughout the transcript of testimony." The certificate of the judge reads: "The foregoing Bill of Exceptions is allowed. Fred McHenry, Judge." The date of allowance does not appear. Attached to the bill of exceptions

is a proof of service by mailing of "the foregoing Bill of Exceptions" on the district attorney for Benton County on August 7, 1956.

On August 22, 1956, there was also filed in this court a document entitled "Short Transcript," which, along with the matters required by ORS 137.190 and 138.180, contains copies of a number of affidavits in support of a motion for change of venue, of an affidavit in support of a motion for inspection of a transcript of a statement made to officers by the appellant, of two affidavits in support of a motion for a bill of particulars filed by the appellant, and of a motion for a new trial. In the body of the bill of exceptions it is recited that the affidavits referred to are "set forth in the transcript filed herewith." There is a similar recital as to the motion for a new trial.

There also came to this court the two envelopes of exhibits above referred to. With the exception of State's Exhibit DD no mention of the exhibits is found in the bill of exceptions. Exception 17 sets forth the objection to the reception in evidence of this exhibit made on the trial by counsel for appellant.

■■ It is a basic rule of our appellate procedure that it is only through the medium of a bill of exceptions that evidence in a law action can be brought into the record for consideration by this court. *Tellkamp v. McIlvaine,* 184 Or 474, 481, 199 P2d 246; *State v. Pulver,* 159 Or 296, 297, 79 P2d 990, and cases there cited. This rule applies as well to affidavits in support of motions for a new trial, change of venue, continuance, and the like. *Harper v. Wilson,* 185 Or 23, 26, 200 P2d 600; *State v. Garner,* 166 Or 1, 5, 108 P2d 274; *State v. De Grace,* 144 Or 159, 165, 22 P2d 896, 90 ALR 232; *State v. McPherson,* 70 Or 371, 373, 141 P

1018; *State v. Finch,* 54 Or 482, 487, 103 P 505; *State v. Kline,* 50 Or 426, 430, 93 P 237. And, while the bill of exceptions may consist of a "transcript of the whole testimony and all of the proceedings had at the trial, including the exhibits offered and received or rejected" (ORS 19.100 (2)), these matters will not constitute a bill of exceptions, nor any part thereof, unless they are duly authenticated by the trial judge. ORS 19.100 (3). *Boice v. Boice,* 196 Or 346, 248 P2d 1069; *Tellkamp v. McIlvaine,* supra, 184 Or at p 479; *Hall v. Pettibone,* 182 Or 334, 339, 187 P2d 166; *Wallowa Land Co. v. McGaffee,* 160 Or 298, 84 P2d 1116; *State v. Chee Gong,* 17 Or 635, 21 P 882.

■ In this case the circuit judge has not by his certificate identified or made a part of the bill of exceptions either the two volumes constituting the transcript of testimony or the exhibits, with the possible exception of State's Exhibit DD. Under well-settled rules these matters are not part of the record and are not open for this court's consideration.

■ This is the first time in our experience and observation that an attempt has been made to incorporate affidavits in the bill of exceptions by including copies of them in the short transcript and referring to them in the bill of exceptions in the manner above stated. The affidavits should be set forth in the bill of exceptions itself. The statute says: "The rulings excepted to shall be stated, with as much evidence, or other matter, as is necessary to explain them, but no more." ORS 19.100 (2). There is no authority for including affidavits such as we are here concerned with in the short transcript, though it may be that by a liberal interpretation of the statute governing bills of exceptions we could hold that this unorthodox procedure is effective to accomplish what seems to have been the purpose of counsel and

the court. But, for reasons to be presently stated, it is unnecessary to decide that question.

■ Counsel for the appellant have suggested to the court the propriety of sending the case back to the circuit court for correction of the circuit judge's certificate. There is no doubt of this court's power to take that course, or of the power of the circuit judge in a proper case to amend the certificate so that the bill of exceptions will conform to the facts. *State ex rel. v. Ekwall,* 135 Or 439, 443, 296 P 57, and cases there cited. In *United Brokers Co. v. Southern Pacific Co.,* 86 Or 607, 616, 169 P 114, this court appears to have itself allowed an amendment of the certificate to the bill of exceptions. If the opinion in the case means what it says, then this court erroneously exercised an authority reserved exclusively to a judge of the circuit court. ORS 19.100 (3), (4).

■ The suggested procedure would avail the appellant nothing, however, unless the trial judge were able to find that a bill of exceptions, which included the matters here in question, was tendered by presenting it to the clerk of the circuit court within 60 days after the entry of the judgment or within an extension of that time properly granted, in accordance with the requirements of ORS 19.100, and that such a bill of exceptions was actually allowed, but that through inadvertence or mistake the certificate failed to conform to the facts. No showing has been made in this court pointing to the existence of such a state of facts.

Nevertheless, being reluctant, as we are, to make a ruling which would have the effect of depriving a party who has been convicted of second degree murder of what may be substantial rights in connection with his appeal, we should be disposed to adopt the sug-

gested procedure were it not for what we have concluded, after mature deliberation, to be an insuperable obstacle in the way of the appellant. Rule 30 of the Circuit Court of the Twenty-First Judicial District, of which Benton County is a part, provides:

"A copy of the proposed bill of exceptions shall be served on the adverse party or his attorney and thereafter presented to the Clerk of the Court, who shall endorse thereon the date of its presentation to him, and the attorney shall thereafter deliver the same to the trial judge."

As heretofore stated, a copy of the "proposed bill of exceptions" was served by mail on the district attorney on August 7, 1956. This is the identical bill of exceptions which was filed with this court on August 22, 1956. It further appears from an affidavit of the official reporter that on April 30, 1956, he delivered a copy of the transcript of testimony to the district attorney. But there is no showing that any of the affidavits, copies of which are included in the short transcript, were ever served on the district attorney, and no "proposed bill of exceptions," of which the transcript of testimony, or the affidavits, or the exhibits, with the exception of State's Exhibit DD, are a part, has ever been served on the district attorney, and no proposed bill of exceptions which includes these other matters, with the possible exception of the affidavits, has ever been presented to the clerk of the circuit court, so far as the record shows.

■ A rule of court, such as that quoted above, which does not contravene the provisions of the Constitution or of statute, has the effect of law and is as binding upon courts and litigants as are statutes. *Hart v. State Ind. Acc. Comm.,* 148 Or 692, 701-702, 38 P2d 698. In the cited case we held that a rule of the Circuit

Court for Marion County identical with the rule of the Twenty-First Judicial District (save for a requirement, which conflicted with the statute, that the bill of exceptions be presented within ten days after the entry of judgment) was reasonable and valid, and that the action of the trial court in authenticating the transcript of testimony as a bill of exceptions, without prior service of a copy thereof upon opposing counsel, was void, and the transcript was expunged from the record. This decision was followed in *Campbell v. City of Portland,* 204 Or 654, 260 P2d 1094, 285 P2d 529, a case arising in Multnomah County and applying a rule of the Circuit Court for the Fourth Judicial District identical with Rule 30 of the Circuit Court for the Twenty-First Judicial District.

In *Ptack v. Strong,* 121 Or 688, 690, 257 P 19, it was suggested by Mr. Justice RAND, writing for the court, that it might be doubted "whether a court has the power to promulgate a rule so inflexible as to wholly deprive the court of the power to exercise a sound judicial discretion in a case where the failure to exercise such discretion may result in depriving a litigant of a legal right, which may be lost without any fault or neglect upon his part." But the court found that the record in that case did not disclose such freedom from fault or neglect, and expunged a bill of exceptions which had been allowed by the trial court notwithstanding the failure of the litigant to comply with the rule. Here, likewise, there is nothing to suggest that the litigant was free from fault.

█ In those circumstances we are compelled to allow the motions of the respondent to the following extent: the transcript of testimony, the affidavits, and the exhibits, except State's Exhibit DD, will be expunged from the record. The question of the motion for a new

trial is a matter of no importance as that motion is based entirely on alleged errors occurring on the trial. Even though it were incorporated in the bill of exceptions it would avail the appellant nothing, for the "denial of a motion for a new trial, based upon alleged error committed on the trial, of which errors the appellant had knowledge at the time, may not be assigned as error on appeal." *Sullivan v. Carpenter,* 184 Or 485, 494, 199 P2d 655.

Let an order be entered in accordance with the foregoing opinion.

## ON REHEARING

On Appellant's Petition for Rehearing

Mix & Fenner, Corvallis, for the petition.

Sidney B. Lewis, Jr., District Attorney, and James W. Walton, Deputy District Attorney, Corvallis, contra.

LUSK, J.

In an affidavit filed in support of a petition for rehearing it is shown that the appellant moved the trial court for an order directing Benton county to

pay the cost of an original and two copies of "the transcript of testimony, instructions, etc., necessary for the appeal"; that the district attorney objected that the county should not be required to pay the cost of copies of the transcript of testimony and that the court on March 1, 1956, ordered the county to pay "the cost of an original copy of the transcript of the evidence", etc. It is not expressly stated that the appellant is an indigent person, but, in view of the court's order, we assume this to be the case.

■ In these circumstances, now called to our attention for the first time, to hold the appellant to a compliance with Rule 30 of the Circuit Court of the Twenty-first Judicial District, which requires service of a copy of the proposed bill of exceptions to be made on the adverse party, would be unwarranted. The objection of the district attorney and the court's acquiescence in that objection had the practical effect of making compliance with the rule impossible. It would, of course, be highly unreasonable to hold that counsel for the appellant were under any duty themselves to bear the expense of procuring copies of the transcript of testimony.

■ Counsel have renewed their suggestion that the record be remitted to the circuit court for the purpose of correcting the record by incorporating the transcript of testimony, affidavits and exhibits in the bill of exceptions. In view of the facts as they are now known to this court, the motion will be allowed. But the limits of the powers of the circuit judge in this regard, as stated in our former opinion, must be kept in mind. He cannot now settle a bill of exceptions anew, but can only correct his certificate—if, in fact, it is erroneous or incomplete—so as to make it conform to what was actually done. The power to make this determination

*nunc pro tunc* is committed to the circuit judge alone. In addition to the cases cited in our former opinion, see *McCann v. Burns,* 73 Or 167, 171, 136 P 659, 143 P 1099, 143 P 916, 143 P 1100; *McGregor v. Oregon R. & N. Co.,* 50 Or 527, 530, 93 P 465; *State v. Jennings,* 48 Or 483, 493, 87 P 524, 89 P 421.

In the brief accompanying the petition for rehearing there is disclosed an evident misapprehension on the part of counsel for the appellant respecting the rules of this court. Counsel say that they were misled by "mimeographed instructions circulated by the Supreme Court to assist persons taking appeals." The so-called mimeographed instructions consist of an outline of our rules adopted June 1, 1955, and which became effective after November 1, 1955, prepared by the Clerk of the Court and designed to aid the county clerks in making up the record on appeal for filing in this court. The particular portion of the outline claimed to have been misleading is a statement in a summary of Rule 7, concerning bills of exceptions in criminal cases, which reads: "do not attach transcript of testimony (to bill of exceptions)." This obviously refers only to the duties of the clerk in respect of the mechanics of making up the record on appeal to be transmitted to this court after the bill of exceptions has been allowed and settled and should not have misled counsel.

 This court has no authority to change the statutory rules governing the settlement of bills of exceptions and has not attempted to do so.

 Whether the transcript of testimony is physically attached to the bill of exceptions or not, it can only be made a part thereof by the authentication and certification of the trial judge. Neither Rule 3, relating to bills of exceptions in civil cases, nor Rule 7,

requires that the transcript of testimony shall not be attached to the bill of exceptions. Further consideration of the subject leads us to the conclusion that since the bill of exceptions and the transcript of testimony, when made a part thereof, constitute but a single document, it is the better practice for counsel to attach them together when the bill is tendered to the clerk of the circuit court and that they should so remain when it is transmitted by the clerk to this court.

The record will be remanded to the circuit court for the purpose hereinabove stated.

### ON THE MERITS

*Robert Mix* argued the cause for appellant. On the briefs were Mix & Fenner, Corvallis.

*James W. Walton,* Deputy District Attorney, and *Sidney B. Lewis, Jr.,* District Attorney, Corvallis, argued the cause and filed a brief for respondent.

Before Tooze*, Acting Chief Justice, and Rossman, Lusk, Brand and Perry**, Justices.

---

\* Died December 21, 1956.
\*\* Chief Justice when this opinion was rendered.

LUSK, J.

The defendant, Martin B. Reyes, was convicted of second degree murder and has appealed.

For an understanding of the legal questions raised by defendant's assignments of error a somewhat full statement of the evidence is required.

On October 24, 1955, the defendant, Clifford "Sonny" Shadd, and Rene Selig were prisoners in the county jail in Grants Pass, Oregon. At the hour of 3:20 on the afternoon of that day, Nelson F. Whipps, a deputy sheriff for Lane County, arrived at the Grants Pass jail and the prisoners named were surrendered to him for transportation to Eugene. The deputy drove them to Eugene in a sheriff's car. The defendant had a gun concealed on his person, which he had shown to Shadd, and en route he told .Shadd that, when they stopped to eat and his handcuffs were removed, he would shoot the deputy. The party (other than Selig, who had previously been let out of the car) arrived at the Eugene municipal jail about 7:30 p. m. Inside the jail, as a part "of a normal routine skin search," Reyes was ordered by Eugene Police Officer Lockhart to remove his clothes. He responded by drawing a .45 Colt automatic pistol from under his belt, forced Lockhart to unlock the door to the county "tank," took the keys from Lockhart and locked him in a cell, released Shadd from another cell, and held up Whipps at the point of the .45 automatic and relieved him of his gun, a .38 revolver, and of the key to the sheriff's car. The defendant and Shadd then fled northward in the car. At a point about three and one-half miles north of Junction City on Highway 99W they flagged down a station wagon driven by Hobart H. Littlefield, Jr., who was accompanied by his wife and their three children.

The defendant forced the Littlefields at gunpoint into the sheriff's car and continued on northward for several miles at a speed of 80 to 90 miles an hour, when he turned the car about and drove back to the vicinity where the station wagon had been left. Here the defendant robbed Littlefield of his money, a $10 bill and possibly a $1 bill, at gunpoint. He and Shadd then locked Littlefield and his family in the sheriff's car and left the scene in the station wagon traveling north. This occurred between 8:45 and 9:00 p. m. The highway on which they were traveling took them toward Corvallis. Meanwhile, a description of the station wagon had been broadcast by police radio, and Basil Carl Branson, a Corvallis police patrolman, had stationed himself on a side road near the highway, a short distance south of the city limits. As he waited there the station wagon came by at a speed of approximately 90 miles an hour, and the officer, recognizing the car from the description which he had heard, gave chase, radioing to other cars that he was in pursuit. Inside the city the station wagon was wrecked as it turned a street corner, and the defendant and Shadd leapt out. The officer captured Shadd immediately, but Reyes made off in the darkness. The .38 revolver which the defendant had taken from Deputy Sheriff Whipps was later found in the station wagon.

At about this time the victim of the homicide, James Roy Appelgate, was driving his automobile in downtown Corvallis, having as his passengers his two daughters, Elaine aged 16 and Susan aged 11, and their friend, Dorothy Blacker aged 14. Elaine and Dorothy had been to a movie, and Mr. Appelgate, accompanied by Susan, had met them after the show was over. A few blocks from the scene of the crime Appelgate took into the car William Bottemiller, a member of the

Corvallis police force, who was at the time in pursuit of the defendant. Acting under Bottemiller's directions, Appelgate drove the car to a service station known as Ben's Associated Service at the corner of Third and Van Buren streets, and parked the car at the rear of the service station building. Although witnesses were prevented by rulings of the court from telling the jury why Bottemiller entered the car and why Appelgate permitted him to do so, it is evident that their common purpose was the pursuit and apprehension of the defendant, who was seen to ''cut across Third street'' as the Appelgate car neared the service station. The service station lot is bordered on the north by Van Buren street, on the east by Third street, on the west by an alley, and on the south by a lattice fence which runs towards the alley as far as the back of a frame garage, the front of which abuts on the alley. The service station building faces north, and between the rear of it and the fence is a space for parking cars. Along the side of the frame garage and on the service station property there was at the time a rack on which were three oil barrels. The Appelgate car was parked between the rear of the building and the fence and near the southeast corner of the building. Bottemiller got out of the car and went around the east side of the building in search of the defendant, who, during this time, appears to have been crouching under the oil barrels on the rack. Appelgate, who had also gotten out of the car and was standing near the door on the driver's side, saw the defendant and exclaimed, ''Here he is.'' The defendant stood up and drew his gun, and at about that time Bottemiller returned, whereupon the defendant ordered Bottemiller to put up his hands, and, when the latter hesitated, said, ''There's kids in the car.'' Bottemiller put up his hands, and, in obedi-

ence to the defendant's command, went over to the fence facing it. Bottemiller testified:

> "I went over to the fence, toward the west end of the fence, and put up my hands. He came up to me and held the .45 in his left hand at a distance like this [indicating]. He didn't point it exactly at me. He pointed it off to the side and with his right hand he reached for my holster and tried to take my gun out of the holster. It didn't come out so he reached in and released the spring. That is on the holster itself. Then he pulled it out. Then he backed away from me."

The officer's gun was a .38 caliber Smith and Wesson revolver. The defendant backed towards the rear of Appelgate's car and to the left or driver's side, and pointed his gun at Appelgate, motioning with his gun and his head toward the car. He attempted to open the left-hand back door of the car, but the children had locked the doors and rolled up the windows. The defendant and Appelgate exchanged words, and Appelgate "jumped" the defendant, and they struggled, moving as they did so past the back of the car and into the alley, where several shots were fired. Appelgate was unarmed. The .38 caliber revolver, which was fully loaded at the time that the defendant seized it, was emptied and three or, possibly, four shots were fired from the automatic. Three shots from the .38 revolver took effect in Appelgate's chest, and at the third he fell to the ground. As he fell the defendant dropped the automatic and fled, and Bottemiller, who had witnessed the struggle, retrieved the gun, and gave chase. Bottemiller fired twice at the defendant and once in the air, but the defendant made good his escape. He was captured the next evening in Monmouth. The .38 revolver which he had taken from Bottemiller was

recovered later in some shrubbery where the defendant had thrown it in his flight. When the defendant was arrested he had a bullet wound in his left forearm, apparently inflicted by a .38 caliber pistol.

Appelgate was removed to the hospital where he lingered until the evening of the following day, when he died from the effect of the gunshot wounds. On his admission to the hospital he was conscious, but in a state of profound shock, and had no pulse or blood pressure. His wife was summoned and saw him about 10:30 p. m. In the presence and hearing of Appelgate a nurse, Jean Allen, asked the attending physician if she should prepare major surgery, and was told that "his condition was too critical, that there was not much hope, and that treatment could continue as it was." Appelgate was acquainted with the nurse, and he said to her while his wife was present, "This is a rough one, isn't it, Jean?" She said, "Yes, it is, but you'll be all right," but he answered, saying, "Don't kid me, I know I won't be." He said to his wife, or in her presence, "I almost got him" and "He sure got me three times," and "Anyway I saved my girls", and further, "He was right up next to me when he shot me."

Two of the three bullets which hit the deceased entered the front of his body and emerged from the back. The third was a .38 caliber bullet, which was found at the end of the bullet path in the back. The physical evidence indicated that the gun was within 8 or 10 inches of the body when it was fired. It was testified that the bullet removed from the victim's back was fired from Bottemiller's revolver.

The first four assignments of error present identical or closely related questions of law. The defendant filed a demurrer to the indictment based on the grounds that the facts stated "* * * do not constitute a

crime," and that the crime charged and the particular circumstances of the crime charged are not directly and certainly stated, such circumstances being necessary to constitute a complete crime as required by ORS 132.530. It is urged in support of the demurrer that the defendant was entitled to be informed by the indictment as to whether or not the state would seek to prove "felony murder," that is, a killing in the commission of or attempt to commit rape, arson, robbery or burglary, defined as first degree murder by ORS 163.010, or a killing in the commission of or attempt to commit any felony other than those specified in ORS 163.010 and defined as second degree murder by ORS 163.020. The court overruled the demurrer. By a motion for a bill of particulars the same information was demanded. The motion was denied. A motion to elect, submitted after the commencement of the trial, would have required the state to elect whether it would prove the charge "by proof of the actual allegations set forth in the indictment," or by proof of felony murder, and, if the latter, the exact felony involved and the person or persons against whom it was committed. At the conclusion of the taking of testimony a like motion was interposed respecting the theory on which the state would go to the jury. These motions were likewise denied. The court submitted to the jury the questions of felony murder in the first and second degrees. As to first degree murder the alleged felonies referred to in the instructions were the robberies shown by the evidence to have been committed against Hobart H. Littlefield, Jr., and William C. Bottemiller. As to second degree murder, the alleged felony referred to in the instructions was assault while armed with a dangerous weapon upon William C. Bottemiller. To the latter instruction the defendant excepted "for the rea-

son that second degree felony murder is not included in this form of indictment," and for the further reason that "there is no transferred intent in the crime of assault unless the assault is accompanied by a battery or attempted battery on the person being assaulted, and, therefore, there would be no transferred assault with a dangerous weapon, or otherwise, from Officer Bottemiller to James Appelgate."

■ The asserted errors in these rulings, insofar as they pertain to first degree murder, need not be considered, since the effect of the verdict of guilty of second degree murder was to acquit the defendant of the higher crime and "he was therefore not prejudiced by any ruling made on that subject." *State v. Meyers,* 57 Or 50, 57, 110 P 407, 33 LRS (ns) 143.

The indictment reads:

"MARTIN B. REYES is accused by the Grand Jury of the County of Benton, by this indictment, of the crime of murder in the first degree committed as follows:

"The said MARTIN B. REYES on the 24th day of October, 1955, in the County of Benton and State of Oregon, then and there being, did then and there unlawfully and feloniously, purposely and of deliberate and premeditated malice, kill one James Roy Appelgate, by shooting the said James Roy Appelgate with a pistol, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon."

■ An indictment for first degree murder in identical form was sustained in *State v. Casey,* 108 Or 386, 213 P 771, 217 P 632, against the claim that it failed to comply with the command of Art I, § 11, of the state constitution, that "In all criminal prosecutions the accused shall have the right * * * to demand the

nature and cause of the accusation against him.'' See, also, *State v. Holland,* 202 Or 656, 658, 669, 277 P2d 386; *State v. Trent,* 122 Or 444, 456, 252 P 975, 259 P 893. The particular ground of the demurrer here is that the indictment does not meet the requirements of ORS 132.530, which reads:

> ''The indictment must be direct and certain as to the party charged, the crime charged and the particular circumstances of the crime charged when such circumstances are necessary to constitute a complete crime.''

An indictment charging second degree murder, no more definite or certain than the one here challenged, was held in *State v. Holland,* supra, to comply with the requirements of that section as well as all other applicable statutes. The demurrer in the case at bar was properly overruled. There is no statute of this state authorizing a bill of particulars in a criminal action. The pleadings and proceedings in criminal actions are prescribed by statute.

> ''All the forms of pleading in criminal actions heretofore existing are abolished; and hereafter the forms of pleading, and the rules by which the sufficiency of pleadings is to be determined, are those prescribed by the statutes relating to criminal procedure.'' ORS 132.510.

> ''The only pleadings on the part of the defendant are the demurrer and plea.'' ORS 135.430.

The statutory provisions are exclusive. *State v. Conklin,* 47 Or 509, 511, 84 P 482; *State v. Gilliam,* 62 Or 136, 140, 124 P 266. The ''common law rules for criminal pleading do not apply, and the statutes control.'' *State v. Holland,* supra, 202 Or at p 669. In Montana and California, which have statutes similar to ours, the courts hold that there is no place for a

bill of particulars. *State v. Bosch,* 125 Mont 566, 587, 242 P2d 477; *People v. Alviso,* 55 Cal 230, 232; *People v. Thorn,* 138 Cal App 714, 735, 33 P2d 5. The court did not err in denying the motion for a bill of particulars. The fact that by the motion the defendant demanded to be informed whether the state intended to rely on a homicide in the commission of a felony, notwithstanding there was no mention of such a felony in the indictment, is sufficient indication that the defendant was well aware of the nature and cause of the accusation.

■■ The motion to elect was likewise devoid of merit. If under this indictment evidence could be received of a felony murder—the question next to be considered—, and, if such evidence was received as well as evidence which showed a premeditated killing, the state was entitled to have the jury instructed on both theories. There is no inconsistency between them. *Sharpe v. The State,* 17 Tex App 486, 512; *People v. Sullivan,* 173 NY 122, 65 NE 989, 63 LRA 353, 93 Am St Rep 582. In the latter case Judge Cullen, speaking for the court, said:

"* * * There was but a single crime charged in the indictment against the defendant,—that of murder in the first degree; and the only issue to be determined by the jury was whether the defendant had been guilty of that crime. Under our statute (Sec. 183, Penal Code), so far as applicable to the case before us, proof, either that the defendant killed the deceased with a deliberate and premeditated design to effect his death, or while the defendant was engaged in the commission of a felony or an attempt to commit a felony, though without any design to take life, established his guilt of the crime charged. 'It is not necessary that a jury, in order to find a verdict, should concur in a single view

of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other.' Murray v. New York L. Ins. Co., 96 N.Y. 614, 48 Am. Rep. 658.''

Only one crime could be proved or sought to be proved as a basis for conviction under the indictment. *State v. Evans,* 109 Or 503, 508-509, 221 P 822. The cases relied on by the defendant (*State v. Lee,* 202 Or 592, 276 P2d 946; *State v. Keelen,* 103 Or 172, 203 P 306, 204 P 162, 204 P 164) are not in point. They hold that where the evidence discloses, or it appears likely that it will disclose, several crimes, proof of any one of which supports the charge, the court may in its discretion compel an election by the prosecutor of the specific offense, upon proof of which he intends to rely when it appears that if the application is denied the defendant will be prejudiced or that he will be prevented from properly making his defense. Thus, for example—and this was the question presented in the Lee case—in a prosecution for statutory rape, where the state is at liberty to prove one of several different offenses under the indictment, and the particular date becomes material because the defendant relies upon an alibi, the court may require an election in order to afford the accused an adequate opportunity to defend himself. But cases of this character deal with separate crimes, proof of any one of which would support the charge in the indictment; whereas here is but one crime of which defendant could have been convicted, to wit, the killing by the defendant of Appelgate by shooting him with a pistol, and, from the sum total of the evidence, including evidence if there was such, that

the killing was connected with a felony, the jury was authorized to determine whether the defendant was guilty of the homicide, and, if so, the degree of the crime. There was nothing to elect, and the court committed no error in denying the motion.

The crucial question on this phase of the case is raised by defendant's exception to the court's instruction that the jury might find the defendant guilty of second degree murder if he killed Appelgate while he was engaged in the commission of an assault while armed with a dangerous weapon upon Officer Bottemiller. One ground of that exception was that "second degree felony murder is not included in this form of indictment." That question is not definitely settled by the decisions of this court. In several such cases the indictments included allegations of the connected felonies: *State v. Jensen,* 209 Or 239, 296 P2d 618; *State v. Merten,* 175 Or 254, 152 P2d 942; *State v. Dorland,* 161 Or 403, 89 P2d 595; *State v. Evans,* supra; *State v. Brown,* 7 Or 186. These cases, therefore, do not involve the question now before us. In *State v. Anderson,* 53 Or 479, 101 P 198, and *State v. Casey,* supra, neither of the indictments specifically alleged a killing in the commission of a felony, but evidence was received in each of these cases which would have supported a conviction of felony murder. In the Anderson case the court took notice of a division of judicial opinion on the question. But because evidence of the collateral felony was admissible in any event, and the general tenor of the court's instructions "clearly indicated to the jury that the defendant was on trial, not for having committed murder while attempting to commit a felony, but with deliberate and premeditated malice" (53 Or at p 483), the question whether the defendant could have been properly convicted of felony murder under

such a form of indictment was left undetermined. In *State v. Casey* the evidence showed that the victim of the crime was killed while the defendant was engaged in the burglary of a railroad car. In an opinion by Mr. Justice BROWN the authorities on this subject were reviewed at considerable length, the court saying:

> "At common law, it was sufficient to charge murder in the common form, and then upon trial, if the proof showed that the crime was committed in the perpetration of robbery, arson, or other felony, this answered the ends of the prosecution and stood instead of proof of malice aforethought.
>
> "Under statutes such as ours, most jurisdictions follow the common-law rule." 108 Or at p 410.

Referring to *State v. Anderson,* supra, the court said that "the learned judge, in speaking for this court, could have added that the great weight of authority is in harmony with the common-law doctrine." The court further said that "The indictment is sufficient to permit the introduction of the evidence of the felonious breaking and entry of the car by defendant," but added that it was unnecessary to decide "that proof of burglary supplies the evidence of deliberation and premeditation in order to constitute murder in the first degree, because of the fact that the court fully charged the jury that proof of premeditation and deliberation was requisite to establish defendant's guilt of murder in the first degree." It was further held that admission of evidence of the burglary was proper to show motive. In *State v. Merten,* supra, the indictment for murder alleged that the crime was committed while the defendant was engaged in the commission of assault and robbery being armed with a dangerous weapon and set out the essential elements of the latter crime. The indictment was sustained against the claim that

more than one crime was charged. Neither the Casey nor Anderson case was cited. The court said that the felony must be alleged. But this statement was unnecessary to the decision as the question was whether it was proper to allege the connected felony in the indictment, not whether it was necessary. In *State v. Hansen,* 195 Or 169, 211, 244 P2d 990, we said that the dictum "was not intended to overrule *State v. Casey* in this regard."

■ While, as will be later shown, evidence of the numerous crimes committed by the defendant on the afternoon and evening of October 24, 1955, was properly admitted in any event, nevertheless, in view of the instruction of the court which authorized the jury to find the defendant guilty of second degree murder if he killed Appelgate in the commission of an assault while armed with a dangerous weapon, the question discussed in the cases we have reviewed is now squarely before us, and we hold, in accordance with the decided weight of authority, that it is not necessary to charge in the indictment that the killing was done in the commission of, or an attempt to commit, another felony, in order to authorize the introduction of proof of such fact. In addition to the authorities cited in *State v. Casey,* supra, see: *State v. King,* 24 Utah 482, 68 P 418, 91 Am St Rep 808; *State v. Bolton,* 65 Mont 74, 212 P 504; *State v. Roselli,* 109 Kan 33, 198 P 195; *Harris v. State,* 34 Wyo 175, 242 P 411; *Sharpe v. The State,* supra (opinion of White, P. J.); *People v. Lytton,* 257 NY 310, 178 NE 290, 79 ALR 503 (per Cardozo, Ch. J.); *People v. Nichols,* 230 NY 221, 129 NE 883; Annotation 63 LRA 393; 26 Am Jur 331, Homicide, § 253; 40 CJS 1038, Homicide, § 148; 2 Warren on Homicide (Perm ed) 80, § 178.

The New York statutes are like ours. In *People v. Nichols,* supra, the court said:

"The purpose of proving participation in the commission of another felony which leads up to and results in the homicide is entirely different than the one suggested by the defendant. There can be no murder without evidence of malice and of a felonious intent and a depraved mind. The indictment was sufficient in form when it simply accused defendant of having killed the deceased 'wilfully, feloniously and with malice aforethought.' (People v. Giblin, 115 N. Y. 196, 198; People v. Schermerhorn, 203 N. Y. 57, 72.) On the trial is was necessary to prove such malice and willful and felonious conduct and this necessity was satisfied in accordance with the provision of the statute by showing that the homicide occurred while the defendant was engaged in the commission of another felony. (People v. Conroy, 97 N. Y. 62, 68, 69; People v. Giblin, 115 N. Y. 196.)"

We conclude that a conviction of felony murder under the form of indictment employed here can be sustained, and we are brought to a consideration of the second exception to the court's instruction on second degree murder in the commission of a felonious assault, namely, that there could be "no transferred intent in the crime of assault unless the assault is accompanied by a battery or attempted battery on the person being assaulted, and, therefore, there would be no transferred assault with a dangerous weapon, or otherwise, from Officer Bottemiller to James Appelgate." With this we will discuss the sixth assignment of error based on the court's refusal to give the following requested instruction:

"You are hereby instructed that in order to find the defendant guilty of a felony murder in any degree, you must establish that any alleged felony in

some direct, unbroken manner caused the death of James Appelgate.''

The contention as to transferred intent is misplaced. The question is not, as counsel for the defendant would have it, whether Reyes, while attempting to shoot Officer Bottemiller, shot Appelgate instead. The question is whether the defendant was properly convicted of second degree murder under ORS 163.020 (1), which reads:

> ''Any person who kills another purposely and maliciously but without deliberation and premeditation, or in the commission or attempt to commit any felony other than rape, arson, robbery or burglary, is guilty of murder in the second degree.''

Assault while armed with a dangerous weapon is a felony other than rape, arson, robbery or burglary; and, if the defendant killed Appelgate while he was engaged in the commission of that felony upon Officer Bottemiller, he was guilty of murder in the second degree even though he had no intention of shooting either man. *State v. Jensen,* supra, 296 P2d at p 626. The jury could have found that, from the time that the defendant pointed the .45 automatic at Bottemiller and ordered him to put up his hands until Appelgate fell to the ground mortally wounded by bullets shot by the defendant from the officer's revolver, Bottemiller was under the threat of the defendant's assault upon him, and intimidated by it, and prevented from carrying out his purpose of arresting the defendant. The assault was obviously committed by the defendant for the purpose of avoiding capture, and the killing of Appelgate was in furtherance of that purpose and so closely linked with the assault upon the officer as to constitute a part of the res gestae of that offense. In such circumstances

the defendant would be guilty of murder in the second degree whether the crime which he originally undertook has been technically completed or not.

The applicable rule is thus stated in 1 Warren on Homicide (Perm ed) 327-328, § 74:

"Where one starts to carry out the purpose to commit one of these crimes, and kills another under circumstances so closely connected with the crime as to be a part of the res gestae thereof, he is guilty of murder in the first degree, whether the crime which he originally undertook has been technically completed or not."

To the same effect is 26 Am Jur 283, Homicide, § 190. In *State v. Brown,* supra, the trial judge gave, and this court approved, the following, among other instructions, in a case involving a killing in the commission of a robbery:

"* * * We can not with rule and measure, mark the exact spot where the crime is completed, as we would distances upon the highway, nor can we mark the precise moment of its completion upon the dial plate. Crime is not a matter of addition or subtraction. It must be ascertained by the intentions and conduct of the persons engaged in it, by the objects which are disclosed by such conduct, and by their act in carrying out these objects." 7 Or at p 206.

Here the court instructed the jury that the words of the statute "in the commission of any felony" "mean that the killing must be accomplished at some time during the interval of the beginning and completion of the crime and assault while armed with a dangerous weapon." In the circumstances of this case no further instruction upon the subject was required, and there was no error in refusing to give the requested instruction above set out.

By assignment of Error No. 5 the defendant raises two questions: (1) The admissibility of evidence of crimes committed by the defendant before he arrived at Ben's Associated Service Station, and (2) failure of the court to instruct a jury as to the limited purpose for which such evidence was received. The defendant shot Appelgate in order to prevent his arrest by the officers of the law, and the other crimes furnished the motive for the killing and evidence of them was, therefore, properly admitted. *State v. Jensen*, supra; *State v. Long*, 195 Or 81, 112-122, 244 P2d 1033; *State v. Bailey*, 179 Or 163, 178, 170 P2d 355; *State v. Walters*, 105 Or 662, 668, 209 P 349; *Commonwealth v. Major*, 198 Pa 290, 47 A 741, 82 Am St Rep 803; *Cortez v. State*, 47 Tex Cr Rep 10, 83 SW 812; *Goodman v. State*, 4 Tex App 349; 1 Wharton's Criminal Evidence (12th ed) § 324. Defendant asserts that Appelgate grappled with the defendant "presumably because of his concern for the safety of his children, and not because he knew or had any interest in the previous activities of the appellant." That was probably one motive but not the only one, for there is ample evidence that Appelgate was engaged in assisting Officer Bottemiller to find and arrest the defendant. It was Appelgate's cry "Here he is" which brought the officer to the scene. But the important consideration is that the defendant must have known that, if Appelgate should succeed in overpowering him, he would be under arrest. This was an eventuality which he wanted very much to avoid, even to the point of killing an innocent man if that should become necessary. That is the way we view the evidence, and it is certainly the view which the jury were entitled to take.

The defendant also requested the court to instruct the jury that the evidence "pertaining to Ben's

Associated Service Station on the night of October 24, 1955" should be applied "solely for the purpose of determining what motive, if any, the defendant had for shooting" Applegate. A part of that evidence was the evidence of the killing of Applegate by the defendant. Most of it was res gestae. The requested instruction was obviously incorrect and properly refused.

 Two other requested instructions would have limited application of "the evidence pertaining to events occurring prior to the time defendant reached Ben's Associated Service Station" to the questions of premeditation and motive. Technically, the requests were not correct for there were other "events" than crimes that occurred prior to the time referred to. However, the court no doubt knew the purpose of the requests, and the question will be treated as though they were correctly framed. *State v. Garver,* 190 Or 291, 306-308, 225 P2d 771, 27 ALR2d 105. Where evidence is admissible for only a limited purpose, for the court to refuse a limiting instruction when requested, is error (*State v. Moore,* 180 Or 502, 176 P2d 631, 177 P2d 413, 332 US 763, 92 L ed 349, 68 S Ct 68), but it is not necessarily prejudicial error. 1 Wharton's Criminal Evidence (12th ed) 566, § 248; *Carroll v. State,* (Tex Cr App) 58 SW 340. The objection to proving other crimes is that it tends to show the defendant to the jury as a bad man generally and to prejudice their minds against the accused and to predispose them to a belief in his guilt. *State v. Jensen,* supra. When evidence of such crimes is properly admitted for a particular purpose, e.g., to show motive, an instruction limiting its consideration to that purpose should be given when requested in order to minimize so far as possible the use of the evidence by a jury for an inadmissible

purpose. But in this case there was evidence of other crimes immediately preceding the killing, which was admissible for all purposes and as to which no limiting instruction was required or would have been proper. If this evidence presented the defendant to the jury as a generally bad and, as well, an extremely dangerous man, this was something inherent in the case. The uncontradicted evidence that the defendant pointed loaded pistols at a police officer and an unarmed, peaceful, law-abiding citizen, that he robbed the officer of his pistol and attempted to make a "get-away" in Appelgate's car, thereby endangering the lives of three children, rendered the failure of the court to limit the consideration of the evidence of the earlier crimes committed by the defendant that day harmless. The error did not substantially affect the rights of the appellant (ORS 19.120), and is not ground for reversal.

Assignment of Error No. 7 is directed to the denial by the court of the defendant's motion interposed "at the conclusion of the trial" for an order annulling the indictment "for the reason that there was no evidence before the grand jury on which it could, in fact, base an indictment of murder in the first degree." As a part of the motion the court was asked to direct the court reporter to provide the defendant with a copy of the transcript of the grand jury proceedings, or, if that should be denied, that the court authorize the defendant to bring in all the Grand Jurors and to make a record of the evidence on which they based their indictment. The motion was properly denied. *State v. Broadhurst,* 184 Or 178, 251, 196 P2d 407, 337 US 906, 93 L ed 1718, 69 S Ct 1046; *State v. Kelliher,* 49 Or 77, 81, 88 P 867. In the latter case we said that "even if the motion will lie to quash an indictment

for irregularities in the proceedings before the grand jury or the district attorney, not prescribed by Chapter VII, [see ORS 135.510], still such motion cannot be permitted to question the sufficiency of the evidence to justify the indictment * * *." It is one thing to allow a defendant on trial for criminal libel to inquire into the scope and character of an investigation made by the grand jury where that is a prime issue in the case (*State v. Putnam*, 53 Or 266, 100 P 2), and quite another thing to sanction a judicial examination of the proceedings of a grand jury upon the unsupported statement of the defendant that the evidence before that body was not sufficient to authorize the return of an indictment. *Costello v. United States*, 350 U.S. 359, 363; 100 L Ed 397. *U. S. v. Smythe*, 104 Fed Supp 283. (Fee, Chief Judge.)

Assignment of Error No. 8 complains of the refusal of the court to withdraw the charge of murder in the first degree. For the reason already given the point is now immaterial.

Assignment of Error No. 9 is based upon the court's refusal to remove from the jury the charge of second degree murder. We have already held that the evidence was sufficient to authorize the jury to find that the defendant killed Appelgate in the commission of an assault while armed with a dangerous weapon upon Bottemiller. It is argued that the only evidence bearing on the question whether the defendant purposely shot Appelgate is the statement of the defendant, "If I shot him it was unintentional," made in the course of an account of the crime given by the defendant to police officers and the district attorney and recorded on a disc, which was received in evidence and marked Exhibit DD. This statement, it is contended, is not controverted, and is therefore binding

on the state, citing 20 Am Jur 465, Evidence, § 551, where it is said:

"* * * Moreover, the truth of exculpatory matter in an admission of one accused of crime, which is introduced in evidence by the state, must be presumed unless its falsity is shown."

Assuming that the quoted sentence is in truth an exculpatory statement and that the prosecution is bound by it in the absence of evidence to the contrary, the court in this case would be usurping the function of the jury if it undertook to declare as a matter of law that the defendant did not shoot Appelgate purposely. It should be enough to say that he shot him three times. It was open to defendant's counsel to argue to the jury, had they so desired, that the shooting was accidental, but that was a question of fact and not an open one in this court. As stated in *State v. Langdon,* 46 N M 277, 127 P2d 875, "it is ordinarily a question for the jury" whether the presumption attaching to an exculpatory statement has been overcome by the prosecution. And,

"* * * It is not to be understood that the state, to prove its falsity, would have to introduce direct and affirmative evidence. It would be enough that its falsity appear to the satisfaction of the jury, beyond a reasonable doubt, from any or all of the facts before the jury." *Forrester v. Texas,* 93 Tex Cr Rep 415, 248 SW 40, 26 ALR 537.

Assignment of Error No. 10 charges error of the court in refusing to give the following instruction:

"You are instructed that if from a consideration of all the evidence you find that the State has proved beyond a reasonable doubt that the defendant is guilty of the unlawful killing of James Appelgate but you have a reasonable doubt as to the

grade of the offense, you must find the defendant guilty of the lowest grade of homicide being manslaughter, and you should return your verdict accordingly.''

ORS 136.050 provides:

''When it appears that the defendant has committed a crime of which there are two or more degrees and there is a reasonable doubt as to the degree of which he is guilty, he can be convicted of the lowest of those degrees only.''

The court instructed the jury as follows:

''* * * If you have a reasonable doubt as to whether or not the defendant is guilty of murder in the first degree, then it will be your duty to consider as to whether or not the defendant is guilty of murder in the second degree. If you have a reasonable doubt as to whether or not the defendant is guilty of murder in the second degree, then it would be your duty to consider as to whether or not the defendant is guilty of manslaughter.''

■ These instructions met fully the requirements of the statute and are in the form ordinarily employed in homicide cases. It was not necessary, therefore, to give the instruction in the form requested by the defendant.

■ Assignment of Error No. 11 is directed to the following instruction given by the court:

''I instruct you that it is a conclusive presumption of the law of an intent to murder from the deliberate use of a deadly weapon causing death within a year.''

The defendant excepted to the instruction on the ground that ''There is no evidence to show that the defendant, Martin B. Reyes, deliberately used any deadly weapon to cause the death of James Appelgate.'' What we

have already said on the subject of the evidence sufficiently disposes of this assignment of error. It is without merit.

The court gave the following instruction:

"I instruct you that any person may arrest another person without a warrant for any crime, including the crime of robbery, as defined in these instructions, committed in his presence. So, in this case, if you find beyond a reasonable doubt that the defendant, Martin B. Reyes, either had or was attempting to commit a crime in the presence of James Roy Appelgate, the said Appelgate under such circumstances under the law was authorized to arrest said defendant.

"I instruct you that an arrest is made by an actual restraint of the person of the defendant or by his submission to the custody of the officer, and that the defendant shall not be subjected to more restraint than is necessary and proper for his arrest and detention."

As his twelfth assignment of error the defendant says that the instruction was erroneous because there was no evidence to support it. The defendant claims that the evidence shows that Appelgate "jumped" the defendant and was not attempting to arrest him. The assignment is without merit for the reasons given in our discussion of Assignment of Error No. 5.

Assignment of Error No. 13 is directed to the admission in evidence over the objection of the defendant of State's Exhibit DD, the disc heretofore referred to on which was recorded the defendant's statement. The record was played in the presence of the jury, and the disc on which it was made was received in evidence. Although a number of exceptions were taken to the court's ruling none of them

has been argued here. Obviously, when the accuracy of the recording device and the identity of the person speaking are fully established, as was done in this case, the recording of an incriminating statement (as this was) of the accused in a criminal case is as much entitled to be received in evidence as a photograph of an object, a person or a place. *State v. Perkins,* 355 Mo 851, 198 SW2d 704, 168 ALR 920, with annotation at p 927. In two of the cases cited in the annotation the discs on which the records were made were admitted in evidence. *Commonwealth v. Clark,* 123 Pa Super 277 187 A 237; *Kilpatrick v. Kilpatrick,* 123 Conn 218, 193 A. 765. Substantially, the only objection now urged by the defendant is that court permitted to go to the jury a machine on which the record could be played back. The contention is that this could have the effect of giving undue weight to the evidence. No authorities have been cited on either side of this question and we have been able to find none. On principal it would seem that the defendant's contention cannot be sustained. The disc, being an exhibit in the case, necessarily went to the jury (ORS 17.320), but without a machine on which the recording could be played back it would serve no purpose. The objection that the evidence would be unduly emphasized could be made as well to a written and signed confession, which, when it is received in evidence, goes to the jury and can be read and reread as many times as the jurors desire. Indeed, a recording has value as evidence which is frequently wanting in a signed confession, for it reproduces the very words used by the person in making the statement in his own voice and with all the added meaning and significance that comes from inflection, emphasis, and the other attributes of speech. In our opinion there

was no error in the court's rulings with regard to State's Exhibit DD.

■ Assignment of Error No. 14 is directed to the denial of defendant's motion to remove from the consideration of the jury the evidence of Appelgate's statements about the shooting made by him in the hospital. In our opinion the evidence was properly admitted. The jury could have found that these statements were the declarations of "a dying person, made * * * under a sense of impending death, respecting the cause of his death." ORS 41.900 (4); *State v. Garver,* supra, 190 Or at p 310; *State v. Casey,* supra, 108 Or at p 400. Cf. *Mercep v. State Ind. Acc. Com.,* 167 Or 460, 469, 118 P2d 1061.

■ Assignment of Error No. 15 challenges the court's denial of the defendant's motion for a change of venue based on numerous affidavits of citizens of Benton County that the defendant could not receive a fair and impartial trial in that county. The state filed opposing affidavits. The examination of the jurors has not been brought to this court, and so we have no way of knowing whether the prediction of defendant's attorneys in their affidavit in support of the motion that the problem of obtaining a fair and unprejudiced jury would be almost insurmountable and would result in many days of questioning of prospective jurors. The affidavits in support of the motion show, among other things, that James Roy Appelgate was a very popular man in Corvallis and Benton County. He had lived in Corvallis for many years and attended the public schools there. He was the father of three children. He belonged to various organizations, including the Benton County Sheriff's Posse, Oregon Association of Mounted Posses, Corvallis Elks, and the Corvallis Methodist Church. The manner in which Mr. Appel-

gate met his death reveals him as a man of rare courage and a high sense of civic responsibility and duty. His tragic death so excited the sympathy of the people of the community that a fund amounting to almost $10,000, to which over 500 persons and organizations contributed, was raised for the benefit of his family. In view of all of these facts, and of the entire record, the conclusive answer to the claim of the defendant that he could not be accorded a fair and impartial trial in Benton County is that the jury returned a verdict of only second degree murder. If they had any prejudices when they entered the jury box they must have been able to put them aside before they returned their verdict.

The final assignment of error complains of an order of the court directing subpenas to issue for more than five witnesses on behalf of state as provided in ORS 139.060. Defendant says that the district attorney's showing in support of the application for the order as to the facts expected to be proved by the witnesses is insufficient. But this is no concern of the defendant's. He was not entitled to be heard on the application, the order was not a ruling against him and could not prejudice him unless it is to be said that to permit the state to prove its case is prejudicial to the defendant. The assignment of error is frivolous.

On December 5, 1956, at this court's direction, the clerk remitted the record to the circuit court for the purpose of securing an amendment of the certificate to the bill of exceptions so as to include therein the transcript of testimony, exhibits and affidavits if the circuit judge should deem that action proper. The circuit judge returned the record without amending the certificate. On December 20, 1956, the day after the oral argument, we again remitted the record for a

like purpose, and on December 28, 1956, the circuit judge made an amended certificate and caused the record to be returned to this court. The state, on January 23, 1957, filed a motion to expunge the transcript of testimony. The amended certificate is effective to make the transcript of testimony and other matters referred to a part of the bill of exceptions. We have construed the certificate liberally to the end that the defendant should not be denied a hearing on the merits. The record shows that the transcript of testimony, exhibits and affidavits were tendered as a part of the bill of exceptions within the time provided by law, and there can be no doubt of the circuit court's power to amend the certificate. See the opinions in this case above cited. The motion to expunge is denied.

The defendant was ably represented by counsel appointed by the court and was given an eminently fair trial. A verdict of first degree murder would have been warranted under the evidence. No error of law justifying reversal and a new trial appears in the record.

The judgment is affirmed.