Argued March 6, affirmed April 3, 1979

# STATE OF OREGON, *Respondent,*
## *v.*
# CHESTER CLARK, *Petitioner.*
## (TC 77-00902, CA 9606, SC 25853)
### 593 P2d 123

J. Michael Alexander, of Brown, Burt and Swanson, P.C., Salem, argued the cause and filed the brief for petitioner.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

TONGUE, J.

## TONGUE, J.

Defendant was convicted of driving while under the influence of intoxicants (ORS 487.540) after a jury trial in which the state offered in evidence the results of a "Breathalyzer" test which showed that defendant's blood had an alcohol content of .13 percent. Both parties also offered testimony relating to the defendant's observable symptoms of alcoholic impairment.[1]

The jury, during the course of its deliberations, sent to the trial judge the following note:

"Even though the law states that .10 means a person is 'under the influence', does this require a juror to go ahead and pronounce the Defendant guilty? Can the breathalyzer say a .10 or over and still I could come back with a verdict of not guilty? I just would like to have the law explained to me again so that it is perfectly clear to me."

---

[1] ORS 487.540 provides, in relevant part:

"(1) A person commits the offense of driving while under the influence of intoxicants if he drives a vehicle while:

"(a) He has a .10 percent or more by weight of alcohol in his blood as shown by chemical analysis of his breath, blood, urine or saliva made under ORS 487.805 to 487.815 and 487.825 to 487.835; or

"(b). He is under the influence of intoxicating liquor, a dangerous drug or narcotic drug."

The complaint in this case was as follows:

"The undersigned Deputy Sheriff certifies and says: that on the 9th day of January, 1977, at 1:22 a.m., Clark, Chester Clarence, did unlawfully operate vehicle on a public highway, to-wit: Belt Line at or near Coberg, located in the city, county and state aforesaid, and did then and there commit the following traffic infraction: Eugene (sic) other violation, *driving under the influence of intoxicants* in violation of state statute in such case made and provided."

It will be noted that the complaint does not specify whether the state intended to proceed under ORS 487.540(1)(a), under which a person commits the offense of driving while under the influence of intoxicants if he drives a vehicle while "he has .10 percent or more by weight of alcohol in his blood," or under ORS 487.540(1)(b), under which a person commits the offense of driving while under the influence of intoxicants if he drives a vehicle while "[h]e is under the influence of intoxicating liquor."

The dissenting opinion by the Court of Appeals would require the state to elect prior to trial whether it was proceeding under ORS 487.540(1)(a) or (b). We do not believe that question to be properly before us on this petition for review.

[35]

In response, the trial judge had the "tape" of its previous instruction to the jury "played back to it." In appealing to the Court of Appeals, defendant assigned as error the giving of that instruction upon the ground that it was "misleading" to the jury and upon the ground that the jury was instructed "in the terms of ORS 487.540(1)(a) in such a manner as to create a conclusive presumption, which is invalid under the Due Process Clause of the Fourteenth Amendment."[2]

The Court of Appeals affirmed defendant's conviction (35 Or App 851, 583 P2d 1142 (1978)). The majority found no error in the instructions complained of, holding that they "correctly stated the law," were

---

[2] The instruction complained of was as follows:

"Oregon Law provides that a person commits the crime of driving while under the influence of intoxicants if he drives a motor vehicle upon a public highway while he was under the influence of intoxicating liquor or had a .10 percent or more by weight of alcohol in his blood as shown by a chemical analysis of his breath. Nothing in this law limits the introduction of any competent evidence which bears upon the question of whether or not a person was under the influence of intoxicants.

"In order to prove its case, the State must prove each one of these elements beyond a reasonable doubt. First, that the crime, if any, was committed within Lane County, Oregon. Second, that the crime, if any, was committed on or about January 9, 1977, the date alleged in the complaint. Third, that the Defendant drove a motor vehicle upon a public highway, and fourth, that at the time of driving the motor vehicle, the Defendant was under the influence of intoxicating liquor or had a .10 percent or more by weight of alcohol in his blood as shown by a chemical analysis of his breath.

"A person is under the influence of liquor if his mental or physical abilities are affected to a noticeable degree. It is not unlawful for a person to drive a motor vehicle after having consumed intoxicating liquor. It is unlawful for that person to drive if he is under the influence of the intoxicating liquor that he drank. A person is under the influence of intoxicating liquor when he has consumed enough intoxicating liquor that his mental or physical abilities are affected to some noticeable degree.

"* * * * *

"Any person is entitled to give an opinion as to whether or not the Defendant was under the influence of intoxicating liquor. In determin-

ing the weight to give such an opinion as evidence, you may take into consideration the experience of the witness, the opportunity of the witness to observe the Defendant and all of the factors which form the basis of the opinion given."

not misleading and did not "embod(y) an impermissible conclusive presumption," so as to forbid consideration by the jury of evidence which might tend to disprove the "Breathalyzer" result, such as (1) "the testimony of those who performed [the Breathalyzer test] that the chemical analysis used in the case was improperly conducted," and (2) "circumstantial evidence from other witnesses (including the defendant) to show that there is such a disparity between what the chemical test shows and other facts that one should *infer* that the test was in some way defective." (35 Or App at 853-56)

The majority went on to hold, however, that before such circumstantial evidence could be offered, "a proper foundation must be laid for it" and that this would "usually" require expert testimony. The majority concluded that evidence challenging the accuracy of a test showing a blood alcohol level of .10 percent or above would be

> "* * * relevant only if proper evidence of the relationship between physical size, blood alcohol content and reasonably expected behavior has been introduced so that the jury has some guidelines to follow in assessing the evidence."

and that

> "* * * absent any expert testimony of the kind described, defendant would not have been entitled to have the jury initially instructed that they should consider any physical observations which had been made of defendant in determining whether or not they were persuaded as to the correctness of the blood alcohol test result." (35 Or App at 856-57)

Defendant's petition for review contends that the Court of Appeals "unnecessarily expanded the scope of its opinion" and that it "erred in holding that expert opinion testimony is a necessary foundation for introducing circumstantial evidence to rebut a breathalyzer reading."[3] We granted review.

[3] It appears to be conceded that such circumstantial evidence is admissible for the purposes of ORS 487.540(1)(b), (i.e., upon the question

In undertaking our consideration of these contentions it should be noted, at the outset, that we agree with the following statement by the majority:

"The gravamen of ORS 487.540(1)(a) is driving with a certain blood alcohol level. The legislature has seen fit to forbid this act, without more. The correctness of the evidence tending to establish the blood alcohol level is thus crucial. Equally crucial is defendant's right to attack the evidence of blood alcohol level." (35 Or App at 856)

We find nothing in ORS 487.540 or in its legislative history, however, to support the apparent assumption by the Court of Appeals that a "chemical analysis" of defendant's breath was intended by the legislature to constitute evidence of such a nature as to require expert testimony as a necessary "foundation" for an "attack" by the defendant on such evidence by the offer of non-expert testimony relating to observation of defendant's conduct and demeanor. Neither do we find any rule of law that requires a "foundation" by expert testimony as a prerequisite to the admission of testimony of "observable symptoms" in such a case, and the Court of Appeals cites no authority for such a proposition.

Indeed, as stated in 7 Wigmore on Evidence 579, § 2090 (Chadbourn rev. 1978):

"There is no general policy or rule that *requires expert testimony* to form a part of the evidence on subjects open to expert testimony. No rule of preference exists for expert witnesses as such * * *."[4]

■ It is true, of course, that all offered evidence must be shown to have some probative value in order to be

_____

whether defendant was driving while "under the influence of intoxicating liquor"), as distinguished from its admissibility for the purpose of ORS 487.540(1)(a) (i.e., upon the question whether defendant was driving while he had "a .10 percent or more weight of alcohol in his blood as shown by chemical analysis of his breath, blood, urine or saliva * * *.")

[4] There are exceptions to this "general rule". *See* 7 Wigmore on Evidence 579, § 2090 (Chadbourn rev. 1978).

relevant. We recognize that some conduct by a defendant in such a case may have no relevance to either the question whether he was "under the influence of intoxicating liquor" (for the purpose of ORS 487.540(1)(b)) or whether he had a blood alcohol content of .10 percent or more (for the purposes of ORS 487.540(1)(a)). In addition, it may be true that some persons may exhibit no observable symptoms of intoxication, and yet may have a blood alcohol content of .10 percent. We must also recognize that in its adoption of ORS 487.540(1)(a), making it an offense to drive an automobile with a blood alcohol content of .10 or more, the legislature apparently assumed, based upon scientific studies and accepted medical knowledge, that the physical and mental condition of a driver with such a level of blood alcohol is impaired to such a degree as to make it unsafe for him to drive a motor vehicle, regardless of observable physical symptoms.[5]

Nevertheless, it does not follow that *no* evidence of any observable physical symptoms has any relevance upon the question whether a "chemical analysis" of the breath of a driver showing a blood alcohol content of .10 percent or more is accurate.

Indeed, as noted by the Court of Appeals, the defendant in such a case is entitled to

"* * * offer circumstantial evidence * * * to show that there is such a disparity between what the chemical test shows and other facts that one should *infer* that the test was in some way defective." (35 Or App at 856)

This court can properly take judicial notice of the fact that observable symptoms or "signs" of alcohol intoxication include the following:

(1) Odor of the breath
(2) Flushed appearance
(3) Lack of muscular coordination
(4) Speech difficulties

[5] *See* Minutes, House Judiciary Committee, May 6, 1975, Appendix A, p. 5.

(5) Disorderly or unusual conduct
(6) Mental disturbance
(7) Visual disorders
(8) Sleepiness
(9) Muscular tremors
(10) Dizziness
(11) Nausea[6]

■ In our opinion, there is a sufficient "foundation," as a matter of either common knowledge or of scientific and medical knowledge, to make "relevant" testimony of the absence of such observable symptoms as circumstantial evidence not only upon the question whether the driver of a motor vehicle is "under the influence of intoxicating liquor" (for the purposes of ORS 487.540(1)(b)), but also upon the question whether (for the purposes of ORS 487.540(1)(a)) a "chemical analysis" of the breath of a driver showing a blood alcohol content of .10 percent or more was an accurate "chemical analysis," without requiring the defendant to "lay a foundation" by expert testimony, as required by the Court of Appeals.

■ It is true that the "chemical analysis" of the breath of a defendant showing that "he has a .10 percent or more weight of alcohol in his blood" for the purposes of ORS 487.540(1)(a) must be performed by a qualified expert. (*See* ORS 487.815(1)) The results of that "chemical analysis," however, whether offered in evidence by the testimony of that expert or by a written record of that "analysis" as made by him, is "expert testimony," and is subject to impeachment on the same basis as any other expert testimony.

■ It is well established in Oregon that the probative weight to be accorded to the testimony of an expert witness is for the jury as the trier of the facts and that it is not bound by the testimony of an expert witness even though it be uncontradicted. *See, e.g., City of Portland v. Ruggero,* 231 Or 624, 630, 373 P2d 970

---

[6] *See* Alcohol and the Impaired Driver, American Medical Association, pp 143-44 (1970).

(1969). Indeed, this court has said that "the evidence of experts in all cases should be received and weighed with caution." *Wendl v. Fuerst,* 68 Or 283, 295, 136 P 1 (1913). *See also Oxley et al v. Linnton Plywood Ass'n.,* 205 Or 78, 103, 284 P2d 766 (1955).

■ The principal evidence of the "chemical analysis" of the alcohol content of the blood of the defendant in this case, as in many such cases, consisted of the testimony of the officer who performed the Breathalyzer test and the written report by that officer entitled "Breathalyzer Operator's Check List".[7] That report set forth, as "checked," some fourteen steps of the "test procedure" and concluded with a "scale reading" of ".13 blood alcohol by weight," as on page 42.

According to a study of the subject as prepared and published in 1970 by the American Medical Association entitled "Alcohol and the Impaired Driver," at p. 102:

"It may be concluded that on comparison of a variety of techniques for both blood and breath analysis, there is an excellent correlation of results obtained, and that the breath methods commonly

---

[7] For technical purposes, the operation of such Breathalyzer equipment is described as follows:

"* * * * The operation consists of four principal phases * * *: (1) flushing of the apparatus with room air; (2) collecting a measured volume of alveolar air; (3) passing the breath sample through potassium dichromate-sulfuric acid solution in an ampul-cuvette and allowing oxidation to proceed; and (4) measuring the resulting color change of the reagent with an integral photoelectric filter photometer. The increased light transmittance through the test ampul, resulting from the color change from the yellow of the dichromate to the green of the chromic sulfate, is measured with a balanced electrical circuit from two matched photovoltaic cells, using the Bunsen principle. A sensitive galvanometer serves as the balance and end point detector. A light bulb is mounted on a movable carriage between the ampuls, and the distance the light must be moved to reestablish the original photometric balance between light transmittance through the ampuls prior to analysis is registered by the movement of a coupled pointer across a linear scale calibrated directly in blood-alcohol concentration from 0 to 0.40 percent w/v(400 Mg/100ml)."

*See* Alcohol and the Impaired Driver, American Medical Association, pp. 111-112 (1970).

[41]

# BREATHALYZER OPERATOR'S CHECK LIST

(FOR USE WITH BREATHALYZER MODELS 800, 900, 900A AND
THE DOMINATOR ALBREATH COMPUTER, MODEL 1)

Name of Subject __*CLARK, CLARENCE*__

Date of Test __*1-9-77*__ Test Location __*L. C. JAIL*__

Requested By __*O. CYARVEX*__ Agency __*LCSO*__

Operator's Name __*G CHESNIKO*__ Permit No. __*4120*__

Operator's Agency __*LCSO*__

Instrument Used: Breathalyzer ☑ Albreath Computer ☐

Instrument Model No. __*900A*__ Comparison Ampoule Control No. __*11*__

Instrument Serial No. __*034-0758*__ Test Ampoule Control No. __*11*__

Has at least 15 minutes elapsed since subject took anything by mouth (drinking, smoking, eating, taking medication, vomited, or regurgitated) before breath test? __*YES*__

Time observation started: __*145 A*__.

## Test Procedure

1. ☑ See that power switch is turned to "ON". Allow instrument to WARM up until thermometer indicates 50° ± 3° C.
2. ☑ See that Null Meter is CENTERED.
3. ☑ See that COMPARISON AMPOULE is in place in lefthand holder.
4. ☑ Remove rubber sleeve from outlet tube and CONNECT to BUBBLER.
5. ☑ GAUGE test ampoule—BREAK open—INSERT bubbler.
6. ☑ Place AMPOULE and BUBBLER in righthand holder. CONNECT BUBBLER to outlet tube.
7. ☑ Turn selector to "TAKE"—FLUSH—turn to "ANALYZE".
8. ☑ When RED LIGHT goes on—PERFORM (a) or (b) below and CHECK box appropriate to instrument used.
   a. ☐ For Breathalyzer, Model 800 or 900 or Albreath Computer—WAIT 1½ MINUTES.
   b. ☑ For Breathalyzer, Model 900A only—WAIT until light marked "READ" goes on.
9. ☑ Turn READING LIGHT on—CENTER null meter with BALANCE wheel.
10. ☑ Pull scale pointer KNOB BACK, set pointer on START line.
11. ☑ Turn selector to "TAKE"—take BREATH sample—turn to "ANALYZE". Time sample taken: __*209 A*__
12. ☑ When RED LIGHT goes on—PERFORM (a) or (b) below and CHECK box appropriate to instrument used.
    a. ☐ For Breathalyzer, Model 800 or 900 or Albreath Computer—WAIT 1½ MINUTES.
    b. ☑ For Breathalyzer, Model 900A only—WAIT until light marked "READ" goes on.
13. ☑ Turn READING LIGHT on—CENTER null meter with BALANCE wheel.
14. ☑ RECORD result below. TURN selector and power switches to "OFF" positions. REMOVE test ampoule.

SCALE READING __*.13*__ % Blood Alcohol by weight
(Grams Alcohol/100 cc. Blood)

__*Daryl L Chesnikov L.CSO 144*__
Operator's Signature

OSHD 1C
7-73

SP*20621-333

used are entirely reliable *when performed by well-trained, competent operators.*" (Emphasis added)

and, at 137:

"Quantitative instrumental breath tests have a sufficiently high correlation with direct blood analysis to be considered interchangeable with them. While instruments for this purpose are very simple to operate, *every precaution must be taken to preclude possibilities of error through improper operation, undetected instrument failure, or improper reagents and supplies.* This is especially true when such devices are operated by police officers with little or no formal technical education." (Emphasis added)

and, at 164:

"It must be recognized that even the most reliable scientific test can produce invalid results through human error or chemical or mechanical defect."

It follows, in our judgment, that because the "chemical analysis" of the blood test of this defendant by the use of a Breathalyzer could "produce invalid results through human error or chemical or mechanical defect," the defendant was entitled to attempt to impeach the accuracy of the testimony of the expert witness relating to the results of that test by any competent evidence. Indeed, as recognized by the Court of Appeals, it was "crucial" that he have the "right to attack" that evidence. (35 Or App at 856)

In addition, it is important to keep in mind the distinction between what may be competent *substantive* evidence for the purpose of *establishing* the alcohol content of the blood of a defendant in such a case and what is competent evidence for the purpose of *impeachment* of the substantive evidence offered by the state, which has the burden of proving beyond a reasonable doubt that the alcohol content of defendant's blood was at least .10 percent. As stated in 3 Wharton's Criminal Evidence 317, § 901 (12th ed. 1955):

"Impeaching evidence is admitted only for the purpose of attacking the credibility of the witness and not as substantive evidence or its truth * * *."

[43]

and, at 330-31, § 913:

> "It is proper to admit evidence of any acts or circumstances which are inconsistent with the relevant testimony of the witness. Any evidence, otherwise proper, which in any respect tends to contradict the witness, is admissible for this purpose."

■ For all of these reasons, we hold that in a prosecution for driving under the influence of intoxicating liquor under ORS 487.540(1)(a) the defendant may offer testimony of non-expert witnesses relating to any or all of the common symptoms or "signs" of intoxication for the purpose of impeachment of the accuracy of a "chemical analysis" by a Breathalyzer test showing a blood alcohol content of .10 percent or more without first laying a "foundation" by expert testimony, as would have been required by the Court of Appeals.

■ For similar reasons, we disagree with the view as expressed by the dissenting opinion of the Court of Appeals to the effect that such evidence of "observable conduct," although "relevant," is inadmissible as incompetent, not because of any requirement of a "foundation" by expert testimony, but because such evidence is "inherently unreliable" (35 Or App at 865), and because any probative value of such evidence is "outweighed" for the reason that its admission would "unduly prolong and confuse the trial in DUII cases." (35 Or App at 865)

It is also contended by the dissent that evidence of "observable conduct" is inadmissible because the legislature intended that liability under ORS 487.540(1)(a) "be premised upon chemical analysis and not on observable symptoms."

■ As previously stated, that statute uses the phrase, ".10 percent or more by weight of alcohol in his blood as shown by chemical analysis of his breath, blood, urine or saliva" made under statutory procedures. The contention by the dissent would be more plausible if the statute stated that one commits the offense if he drives: "(a) when a chemical analysis (etc.) indicates

[44]

the presence of .10 percent or more by weight of alcohol in his blood." In our view, however, the more reasonable reading of the statute is that the driver must be found in fact to have .10 percent blood alcohol *and* that this must be shown by a chemical analysis. In other words, the state cannot establish a violation of ORS 487.540(1)(a) without a chemical analysis properly performed, but the analysis must "show" the actual presence of that percentage in the blood, not merely in the instrument reading.[8]

■ Despite our disagreement with the Court of Appeals, however, it does not follow that defendant's conviction must be reversed. As stated originally, both the state and the defendant offered evidence of defendant's "observable conduct." Defendant's sole assignments of error in its appeal to the Court of Appeals were that the trial court instructions to the jury were improper in that (1) the instructions were "misleading" to the jury, and (2) the court instructed the jury in the terms of ORS 487.540(1)(a) in such a manner as to create an invalid conclusive presumption. Although these instructions were not models of clarity, we agree with the Court of Appeals in its holding that they were not fatally defective for either of these reasons.

We affirm the decision of the Court of Appeals in its affirmance of the conviction of the defendant, but for the reasons stated in this opinion.

---

[8] The dissent also contends that "there is a variety of readily available and reliable methods of proof by which defendant can effectively impeach the Breathalyzer." The only two methods suggested by the dissent, however, are (1) "defendant may require that the state provide him with the Breathalyzer ampul which can be used to retest the Breathalyzer" and (2) defendant may demand an "independent blood test" as provided by ORS 487.810.

It does not follow, however, that because other evidence is available a defendant can be denied the right to offer impeachment evidence that is otherwise competent and relevant. In addition, according to *State v. Michener,* 25 Or App 523, 527, 550 P2d 449 (1976) (cited by the dissent), there may be a conflict of opinion among experts as to whether such an ampul can be accurately retested apart from the fact that such a retest could not correct errors in the taking of the original test. Also, an "independent blood test" may not always be available to a defendant, as a practical matter, depending upon where he is arrested and what facilities are then and there available for such blood test.